No. 31,972

THE STATE HIGHWAY COMMISSION OF KANSAS, *Appellee*, v. THE EMPIRE OIL AND REFINING COMPANY, *Appellant*.

(40 P. 2d 355)

162 

 Opinion filed
January 26, 1935. 

*James W. Finley, Hayes McCoy* and *Charles C. Julien,* all of Bartlesville, Okla., for the appellant.

*Wint Smith,* assistant attorney-general, *W. N. Calkins,* of El Dorado, and *Otho W. Lomax,* of Cherryvale, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the State Highway Commission to recover damages from the Empire Oil and Refining Company, resulting from the burning of a state highway bridge across a watercourse. Plaintiff recovered, and defendant appeals.

Defendant had oil wells in a watershed east of highway 77, drained by a watercourse. A cement bridge was erected on the highway over the watercourse. Defendant permitted oil and refuse to escape from its wells, flow down the watercourse, and accumulate under and below the bridge. Whether this was the result of negligence is not involved, the petition having been amended to eliminate charge of negligence. The watercourse was dry at the time of the fire.

The highway commission was authorized by statute to destroy weeds on the highway, and the usual method was by burning. Two employees of plaintiff, Ryan and Carter, went to the vicinity of the bridge to burn weeds and grass on the highway, south of the bridge. A small unused tract of land adjoining the highway, belonging to Waldon, who lived a little way north of the bridge, was covered with weeds. Farmers along the highway would want their weeds burned. Highway employees would obtain permission to do this. Carter was not a witness, but the testimony indicated that Ryan was warranted in believing he and Carter had permission to start their fire on the Waldon land. The matter of obtaining permission is not material, and the testimony will not be reproduced further than this: While Mrs. Waldon testified she gave no consent, she testified she told Carter if they did set out a fire to be careful.

The fire was set 60 feet from the highway, found its way to the watercourse, the oil and refuse were ignited, and the intense heat destroyed the bridge.

The conditions at the bridge were described by Waldon, a witness for defendant, in a statement he made, which was admitted without objection, on his cross-examination:

"I put in a gas line about one hundred feet west of the bridge. The ditch tapered and formed a dam at that point. I cut the pipe line in two, so in high

water the dam could wash out. This was better than two years ago when I cut the line. At the time of the fire, brush and tumbleweeds had added to the dam and the ditch had lots of oil in it. There has been oil in that slough mighty near all the time since the ditch was dug. This oil comes from the wells on the east side of the road, and hundreds of barrels of oil have been permitted to run down that slough. Luke McLain, the Empire head roustabout, had instructions to clear out this slough just before they started to rebuild the bridge. When the fire started, most of the oil was below the bridge, west and under the bridge. It was mostly dirt and settlings soaked with base sediment and oil.

¨"I have lived on this place twenty-six years the first day of January of this year, and have had always more or less argument with the Empire folks on account of the fact they have always let oil get loose and run all over the land. The fire destroyed the bridge, and there was nothing to do but put in a new bridge."

Defendant contends Ryan and Carter were guilty of contributory negligence, which prevented recovery by their superior, the plaintiff. Contributory negligence was submitted by the court to the jury as a defense to the action. All the conditions and circumstances of the fire, including knowledge of Ryan and Carter of existence of oil refuse in the bed of the creek, were fully described in the testimony. The question whether they were guilty of contributory negligence in starting the fire was submitted to the jury by a special interrogatory. The jury answered, the employees were not guilty of contributory negligence. The finding expressed a fair inference from the testimony, and that closes discussion of the question of fact. It may be added, however, that inasmuch as the action was not based on negligence, contributory negligence, in the sense of an antidote to liability for negligence, was not a defense.

Defendant permitted its oil and inflammable refuse to make their way down the creek from defendant's land, and to accumulate below and at the bridge. The jury found specially the bridge was destroyed by the intense heat from burning oil and refuse. The court instructed the jury regarding the statutory duty of defendant to keep its oil and refuse at home. The statute reads:

"It shall be unlawful for any person, having possession or control of any well drilled, or being drilled for oil or gas, either as contractor, owner, lessee, agent or manager, or in any other capacity, to permit salt water, oil or refuse from any such well, to escape upon the ground and flow away from the immediate vicinity of such well, and it shall be the duty of any such person to keep such salt water, oil or refuse safely confined in tanks, pipe lines or ponds, so as to prevent the escape thereof: *Provided, however,* That this act shall not be construed to apply to the escape of salt water, oil or refuse be-

cause of circumstances beyond the control of the person in the possession or control of such well and under circumstances which could not have been reasonably anticipated and guarded against." (R. S. 55-121.)

By special findings, based on ample evidence, the jury found defendant permitted oil refuse to escape and flow away, and found the escape and flowing away were not because of circumstances beyond defendant's control or circumstances which could not be reasonably anticipated and guarded against.

The statute was enacted because of the vagrant character of unconfined salt water, oil and refuse, and their inherent quality of destructiveness. They destroy vegetation, pollute streams, foul wells, and oil and oil refuse create fire hazard. The statute deals specifically with confinement, and confinement is at the peril of the person whose duty it is to confine, subject only to *vis major* and some other exceptions not material here.

Aside from the statute, as long ago as 1917 this court adopted the general principle of liability without fault, as stated by Lord Blackburn in *Fletcher v. Rylands*, L. R. I. Exch. 263 (1866). The court adheres to the principle. (*Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P. 2d 953.) It is not necessary to trace the history of that celebrated case in England and in the United States. At first the doctrine was received with disfavor in this country, and it is still in disfavor in some jurisdictions. The doctrine was accepted by other American courts, and the tendency now is toward recognition of the doctrine as finally developed in England. Indeed, some American courts have extended it. (*Green v. General Petroleum Corp.* [1928], 205 Cal. 328.) There is a carefully considered discussion of the subject in Harper on Torts, §§ 156-164, "The Rule in *Rylands v. Fletcher.*" (See particularly § 160.)

In an article in 48 Harvard Law Review, 216 (December, 1934), "Aviation Under the Common Law," Francis H. Bohlen discusses the opinion in a recent case involving collision of an airplane with a transmission tower. The judge overruled a demurrer to a count of a declaration. The article proceeds:

"In doing so he followed the precedent set by the English cases which have interpreted the doctrine of *Rylands v. Fletcher* and by a number of recent American decisions. These authorities recognize that certain activities, though involving in their very nature a risk of serious injury to others which cannot be eliminated by any practicable precautions, still have such social value that it is impossible to regard the pursuit of them as either negligence or a nuisance. Consequently where some purpose is served peculiar to those in charge

rather than common to the great mass of mankind, it is held that these ventures must be carried on at the risk of those interested in them and not at the risk of those without such interest but whose bad luck it is to be or to possess property in the neighborhood of their prosecution. Of some curiosity is the fact that these cases apply the effect, not perhaps of *Rylands v. Fletcher* itself, but of the law which has· developed out of that case in Great Britain. It is significant that this tendency to bring American law into accord with the British law synchronizes with the realization that America is no longer a frontier country. . . ."

The statute deals primarily with the subject of confinement. Should salt water or oil or refuse escape, for what subsequent harmful consequences must the producer respond in damages?

That escape of the oil and refuse, and their flowing down to the bridge, were causes in fact of destruction of the bridge is undeniable. Defendant contends, however, the inflammable material, waiting only for flame to ignite it to destroy the bridge, was not the "proximate cause" of the burning of the bridge, and contends the fire which was started by Ryan and Carter, was an independent, unrelated cause, and the proximate cause of destruction of the bridge.

An examination of published volumes 1 and 2 of the Restatement of the Law of Torts will disclose that the term "proximate cause" has been discarded, and the term "legal cause" has been adopted. The change not only makes a scientific statement of the causation factor of tort liability possible, but should be practically helpful to trial courts in framing instructions to juries, since the courts are relieved of explaining the unexplainable fact that while consequences must be proximate, they may be remote. The term "legal cause" will be used here.

Legal cause is defined by section 9 of the Torts Restatement as follows:

"The words 'legal cause' are used throughout the Restatement of this subject to denote the fact that the manner in which the actor's tortious conduct has resulted in an invasion of some legally protected interest of another is such that the law regards it just to hold the actor responsible for such harm."

This is not a section to be embodied in instructions to juries. It is a discrimination, for purpose of the Restatement, of the cause factor in tort liability. While, as indicated in Comment *b* on the section, the act or omission must be a substantial factor in bringing about the harm (see §431), the principles and rules which determine whether a particular act or omission is legal cause of a particular result, are stated later. The question now before the court is, there-

fore, whether unlawful escape of oil and refuse from defendant's premises constituted legal cause of the burning of the bridge.

In the portion of the opinion in *Fletcher v. Rylands,* quoted in *Helms v. Oil Co.,* 102 Kan. 164, 169 Pac. 208, appears the following:

"But for his act in bringing it there no mischief could have accrued, and it seems but just that he should at his peril keep it there so that no mischief may accrue, or answer for the natural and anticipated consequences." (p. 169.)

So far as known, no dissentient from the doctrine of liability without fault has complained about this tacit limitation on liability after escape has occurred. Without expressing opinion that in every kind of case liability extends only to natural and anticipated consequences, legal cause may be determined in this case as if that were the extent of liability.

The legislature foresaw disaster if salt water and oil and refuse were not confined. Defendant is held to have foreseen disaster would follow as consequence of escape, and some of these consequences would inevitably involve the contributing factor of human intervention. The wandering substances threatening calamity wherever they may go, constitute a common enemy, and a perfectly natural and foreseeable consequence is that methods of protection will be taken to avert threatened danger. The Squibb case illustrates the principle.

At Wichita, escape of salt water from an oil field portended destruction of the city's principal park system and the city's water supply. By correspondence and by conference between city officials and oil producers, an agreement was reached which was evidenced by a city ordinance granting revocable permission to connect a pipe line, extending from the oil field, with the city's sewer system. The pipe line was constructed and connected. There were subsequent changes in the city's sewer and drainage systems. In a district of the city in which the inhabitants depended on wells, their water supply was ruined by the salt water. (*Berry v. Shell Petroleum Co.,* 140 Kan. 94, 33 P. 2d 953.)

The producers having created the condition which made harm imminent, municipal action of some kind was natural and foreseeable, and the particular action taken bore no resemblance to an independent, unrelated, intervening and superseding cause within the decision in *Railway Co. v. Columbia,* 65 Kan. 390, 69 Pac. 338.

Instead of permitting salt water to escape at their own premises, the producers took it by pipe line to the sewer and released it there.

The salt water possessed the same potency for harm at the sewer connection, and below, which it possessed before it entered the pipe line, and the statutory duty to confine at the producers' peril was not discharged and was not shifted. Neither the producers nor the city, nor both acting in concert, could nullify or minimize the obligation imposed on the producers by the statute. The city's facilities became the producers' facilities for disposing of the salt water, and whether the city's facilities were adequate or inadequate, efficient or inefficient, carefully managed or negligently managed, the same duty to prevent harm rested on the producers while the salt water was in the city's sewer and drainage systems, which rested on them at the oil field. At the origin of the pipe line in the oil field, nothing but intervention of act of God, unexpectable act of some intruder, or other external, disconnected and unrelated cause of escape, could exculpate.

While in the present case Carter and Ryan set the fire which ignited the refuse in the watercourse, the conduct of defendant in releasing the refuse constituted legal cause of destruction of the bridge, because ignition by fire was natural and foreseeable.

It is a matter of common knowledge that in this state cattle ranges are burned. Farmers burn their cornstalks and straw stacks, and burn their weeds, both on waste and cultivated land. The highway commission is required, at least once a year, to cause to be removed from public highways "all cockleburs, Rocky Mountain sand burrs, burdocks, sunflowers, Johnson grass, and all such other obnoxious weeds as may be injurious to the highways or the best interests of the farming community." (R. S. 68-546.) The effective and the common method employed to execute this statute is by burning the vegetation. Ryan testified farmers along the highways would want their weeds burned, and the fire which destroyed the bridge was set in connection with discharge of statutory duty. It was perfectly natural and to be anticipated that the inflammable substances, flowing and accumulating as gravity willed, in territory where fire was likely, and across the highway where fire was certain, might be ignited, and if ignited, would destroy anything within reach destroyable by heat.

The court sufficiently instructed the jury on the subject of the act of Ryan and Carter as an independent agency, and sufficiently instructed the jury on the subject of "proximate cause."

There is nothing else of importance in the case.

The judgment of the district court is affirmed.