Anna Mae BRYANT, Administratrix of the Estate of James McKinley Bryant, Deceased, et al., Plaintiffs,

v.

HERCULES INCORPORATED and the Old Republic Insurance Co., Defendants.

Della Sue RICE, Administratrix of the Estate of Will Rice, Deceased, Plaintiff,

v.

HERCULES INCORPORATED and the Old Republic Insurance Co., Defendants.

Civ. A. Nos. 2396, 2397.

United States District Court, W. D. Kentucky, Owensboro Division.

July 13, 1970.

See also, 431 F.2d 1385.

Charles A. Williams, Clifford L. Walters, Paducah, Ky., William E. Rummage, Beard, Rummage & Kamuf, Owensboro, Ky., for plaintiffs.

James M. Graves, Edward H. Stopher, Boehl, Stopher, Graves & Deindoerfer, Louisville, Ky., for defendant, Old Republic Ins. Co.

Edgar A. Zingman, Wyatt, Grafton & Sloss, Louisville, Ky., for defendant, Hercules Inc.

## ORDER

JAMES F. GORDON, Chief Judge.

This matter comes on on the motion of the defendant Hercules under Rule 56 of the Rules of Civil Procedure, for summary judgment against the plaintiffs, and the Court has decided to grant the motion.

The complaints herein were filed by plaintiffs as the personal representatives of eight employees of Peabody Coal Company who were fatally injured in an explosion on August 7, 1968 in the company's River Queen Underground Mine No. 1 near Greenville, Kentucky. The complaints allege that the deaths resulted from the manufacture, packaging and selling by Hercules of explosives to Peabody, which explosives allegedly were being used at the time and place of an explosion in which the explosives allegedly contributed to the unplanned explosion. Plaintiffs maintain that Hercules is liable in tort for (1) failing to make known inherent dangers in handling of its product; (2) failure to make known impact sensitivity thereof; (3) failure to instruct in safe use; and (4) general negligence in manufacture and distribution.

After consideration of the evidence introduced on behalf of the parties, it is the Court's opinion that it is perfectly clear that no issue of fact is involved and that inquiry into the facts at trial will add nothing to a correct application of the law. There does not appear to be any dispute as to the evidentiary facts in this case or the conclusions to be drawn therefrom.

The defendant Hercules relies in support of its motion for summary judgment on the "Final Report of Major Mine Explosion Disaster River Queen Underground Mine No. 1, Peabody Coal Company, Muhlenberg County, Kentucky, August 7, 1968" (herein called the "Federal Report") prepared by the United States Bureau of Mines. Plaintiffs have stated in answers to interrogatories that they have no information contradicting the facts or conclusions contained in the Federal Report. The defendant Hercules also tendered with its motion and relies on the practically identical report prepared by the Kentucky Department of Mines and Minerals entitled "Report of Multiple Fatal Explosives Accident River Queen Underground Mine No. 1 Peabody Coal Company, Greenville, Muhlenberg County, Kentucky, August 7, 1968" (herein called the "Kentucky Report").

The defendant Hercules further relies on the "Transcript of Testimony At Hearing Concerning Disaster At River Queen Mine Muhlenberg County, Kentucky, August 7, 1968" (herein called the "Transcript") which underlies the Federal Report and the Kentucky Report. It contains the sworn testimony taken immediately after the mine explosion by an official investigating team. The investigation was made pursuant to the provisions of the Federal Coal Mine Safety Act, 30 USC §§ 451–483. Again plaintiffs have answered interrogatories to the effect that they do not contest the facts or conclusions contained in the Transcript.

Both the Federal and Kentucky Reports state that samples of explosives, identified by the manufacturer's markings as being from the same batches as explosives in use at the time of the accidental explosion, were tested at the Bureau of Mines Explosives Research Center in Pittsburgh after the mine disaster. The tests showed that the explosives met all of the standards of permissibility established by the Bureau of Mines for such explosives. The Research Center also concluded that the tested explosives were not abnormally impact-sensitive for permissible explosives. There is no

evidence in the record before the Court that the explosives sold by the defendant Hercules for use in the River Queen Underground Mine No. 1 were defective or that the fatalities which occurred there were due to negligence in the manufacture or packaging of the dynamite.

With respect to the cause of the fatal explosion, which occurred in a batch of explosives left on top of a coal drill, the Federal Report sets out on page 17 the following determinations:

"11. The nature of the damage to the coal drill clearly indicated intense, concentrated, disintegrating force, radiating from the midsection of the machine, entirely unlike the sort of damage seen when forces of an explosion thrust against equipment.

\*   \*   \*   \*   \*   \*

"14. The coal drill was left parked in the line of blast in No. 5 entry, approximately 45 feet outby the face while a round of four holes was fired simultaneously with instantaneous detonators.

"15. A fragment thrown off the face by blasting could, without question, have struck any explosives or detonators on the drill with forceful impact."

Based on the statutory investigation, the Federal Report concludes, in language which is substantially identical to the language used in the Kentucky Report, as follows:

"*Cause of Explosion*

"It was the consensus of the investigating committee:

"That the explosion was initiated by a fragment of material, which was projected from the face of No. 5 entry by blasting, and which struck and detonated an unknown, but appreciable, quantity of permissible explosive on the coal drill parked a short distance from the face in direct line of blast; and

"That coal dust in the face areas was ignited by the detonation of the unconfined explosives, but propagation did not extend far from the working area.

"Failure to store and transport explosives in an approved manner was a primary factor in this disaster." Federal Report, p. 18.

Also offered in support of the motion for summary judgment are copies of the Coal Mine Inspection Reports for five inspections conducted by the Bureau of Mines at the mine in question, prior to the date of the explosion. These inspection reports show that violations of the Federal Mine Safety Code had been observed by federal inspectors and the supervisory personnel at the mine had been called on to correct such violations before mining could proceed. Inspection reports mailed to various officials of the Peabody Coal Company, described the violations and expressly refer to Article IV, Section 4c of the Mine Safety Code, which sets 50 feet as the necessary distance from the face for storage of dynamite and which requires that, without limitation as to distance, dynamite be located out of the line of blast. This provision of the Mine Safety Code was thereby brought to the attention of both the general superintendent and the mine superintendent in charge of the particular mine in which the explosion occurred on repeated occasions prior to the explosion in issue here.

Plaintiffs in no way contradict the facts and conclusions contained in the various documents discussed above. In the single affidavit opposing the motion for summary judgment, a registered engineer states that "it is not considered normal in the handling of explosives that they would be detonated by impact from debris". The engineer, however, does not say he has studied the circumstances surrounding the explosion which occurred on August 7, 1968 at first hand or even the facts as determined by the official investigating team and set forth in the Federal and Kentucky Reports. The ba-

sic conclusion of both reports was that the fatal explosion was initiated by a fragment which was shot off the face by a planned explosion and which traveled approximately 45 feet into an unshielded pile of dynamite. The engineer's affidavit does not purport to dispute that conclusion other than possibly suggesting that such initiation is not considered "normal".

Since the plaintiffs have no information contradicting the facts and conclusions contained in the various official documents discussed above, they are conclusive herein. Regarding their admissibility into evidence see Anderson v. Swift & Co., 380 F.2d 988, 992 (6th Cir. 1967); Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467, 473 (3rd Cir. 1950); Federal Official Records Statute, 28 USC § 1733.

The law of Kentucky respecting the duty of a manufacturer of dynamite has been recently discussed and applied in Hercules Powder Co. v. Hicks, Ky., 453 S.W.2d 583 (opinion rendered February 27, 1970, petition for rehearing denied June 5, 1970). In that case Hercules was supplying dynamite through a distributor for use by Wabassco, the employer of the plaintiffs Hicks and Cox. Wabassco was developing a subdivision and for several months had used dynamite to cut ditches in which sewer lines were placed. On the day of the accident a shot was fired in rocky terrain. After lunch the men began cleaning out the bottom of the trench where they encountered a high place. The substitute foreman on the day of the accident and other supervisory personnel of Wabassco knew that a high place can occur when part of the charge does not fire. The substitute foreman nevertheless directed Hicks to knock off the high spot with a pneumatic hammer. Cox and Hicks first probed a little in the broken surface of the rock with a screwdriver and then used the hammer on it. An explosion resulted as soon as it was used.

It was claimed that the manufacturer Hercules was in some way derelict in failing to warn the user against this improper procedure for clearing an area where unfired dynamite was suspected. It was also claimed that the distributor for Hercules, one Herbert, knew the user was incompetent and owed a duty to the plaintiffs to warn and instruct against the hazard of using manual or powered tools on a high spot. The Court of Appeals of Kentucky reversed judgments entered on a verdict against both Hercules and Herbert and directed entry of judgments n. o. v. dismissing the complaints. The Court held that liability of a manufacturer could not be rested on the alleged failure to warn of a hazard that was either already known to the plaintiff or was known to the supervisory personnel of the plaintiffs' employer.

In this regard, the Court stated:

"On the basic argument that the principles claimed in the Restatement of Torts 2d furnished ground for fastening liability on Hercules, the appellees lay heavy stress upon Eck v. E. I. DuPont DeNemours & Company, 393 F.2d 197 (CA7) (1968), and Post v. American Cleaning Equipment Corporation, Ky., 437 S.W.2d 516. An examination of those decisions reveals that each of them was rested upon a duty to warn of a danger known to the supplier but unknown to the person whom the supplier reasonably could anticipate would be affected by the use and unknown danger. The danger was personally known to Hicks. Cox's foreman also knew the danger, and the defendants had no reason to know that he would not warn Cox. Hicks and Cox needed no additional warning of it. Hence, the rationale of Eck and Post affords no basis for imposing upon Hercules a duty to warn in the present case. We conclude that the trial court erred in failing to direct a verdict in behalf of Hercules and again in denying Hercules' motion for judgment n. o. v.

"We think the same reasoning applies as to Herbert's [the immediate seller's] liability.

\* \* \* \* \* \*

"[I]t was shown that other incidents of extricating unexploded dynamite from such 'high spots' had occurred during the work's progress. The responsible and supervisory employees of Wabassco knew of the problem and the danger. We do not perceive that Herbert's duty to warn, as urged by appellees, could extend to a requirement that he see to it that each and every employee of Wabassco should have individual warning and instruction. If Eck v. E. I. DuPont De-Nemours & Company, 393 F.2d 197 (CA7), may be read as supporting a contrary view, we are unwilling to follow it. To impose such an all-encompassing duty on the supplier of a chattel would transcend the bounds of reason and practicality." 453 S.W.2d 590.

The *Hicks* case runs on all fours with this case. The supervision in the River Queen Underground Mine No. 1 knew it was dangerous to leave explosives exposed only 45 feet from a prepared blast. The company work rules were designed to assure removal of surplus explosives before blasting the face. The shot firers knew it was dangerous to leave a drill machine in the line of blast and that explosives should not be brought up to the face and left in the line of blast. There was also an awareness that a blast will shoot off fragments of the face with sufficient force to detonate dynamite. The shot firer Boyken testified, Transcript 49–50:

23. Have you ever observed or helped shoot a place when the machine was in direct line?

A. No, sir. It will bust out the lens on the lights on the machine.

24. Say you had explosives on the machines or in the area, this would be more of a concern to you, parking the machine out of the way, or the lens?

A. If the explosives were on there —there wouldn't be any explosives on there to begin with, and that would very definitely come to my attention, I will tell you.

Further, the defendant Hercules expressly covered the hazard presented by leaving surplus explosives near the point of blast in the "Do's and Don't's", which are promulgated by the Institute of Makers of Explosives and are distributed by manufacturers of explosives in the United States. A copy was filed with the answers of Hercules to plaintiffs' interrogatories. The legend on the front page states "For consumers in transporting, storing, handling and using high explosives and permissible explosives" and the "Do's and Don't's" contain the following pertinent matter:

"IN UNDERGROUND WORK

"67. DO use permissible explosives only in the manner specified by the United States Bureau of Mines.

\* \* \* \* \* \*

"BEFORE AND AFTER FIRING

"70. DON'T fire a blast without a positive signal from the one in charge, who has made certain that all surplus explosives are in a safe place, all persons and vehicles are at a safe distance or under sufficient cover, and that adequate warning has been given."

And under the heading WHEN USING EXPLOSIVES:

"22. DON'T place explosives where they may be exposed to flame, excessive heat, sparks, or impact."

It makes no sense to contend that the foregoing warnings given by the defendant are defective because they are beyond the literacy level of each miner. The task of adequate warning is one of

communication to the men in charge at the point of blasting not to illiterate miners and other employees not concerned with or responsible for the firing. Warnings with respect to industrial techniques are for supervision, those in control. The testimony taken by the mine investigators shows that all the supervisory personnel were aware of the requirement of removing surplus explosives before shooting. In addition this had been called to the attention of supervision during inspections of the mine. Federal inspectors had caused the supervisory personnel to correct violations of Article IV, Section 4c of the Federal Mine Safety Code which sets 50 feet as the necessary distance for explosives to be kept from the face and requires that regardless of the distance they be kept out of the line of blast. A violation of this regulation was corrected during the inspection made on February 26–29, 1968, and written notice thereof was contained in the Federal Mine Inspection Report sent to both the general superintendent and the mine superintendent, who was still in charge of that mine and present on August 7, 1968.

The applicable Kentucky statute also requires that surplus dynamite be protected from an intended blast:

> "Explosives kept near the working faces in individual containers shall be kept * * * in a location out of line of blast where they will not likely be subjected to shock." KRS 352.240 (7).

■ The Transcript shows that supervisory personnel and miners alike knew that it was dangerous to keep a substantial quantity of surplus explosives at the face at the time of a blast. It would be a fantastic stretch of the law to require the manufacturer of explosives to go beyond its written warnings and personally warn every miner not to tolerate the stacking of dynamite near a point of blast when it is something that supervision is already aware of, something that is covered by state and federal law and something that federal inspectors specifically call to the attention of those in direct supervisory control at the mine.

■ The Court of Appeals of Kentucky in the *Hicks* case indicates that no such extension of the law can be found in the Restatement (Second), Torts, and no precedent for it is known to this Court. Hercules Powder Co. v. Hicks, *supra,* 453 S.W.2d 583. A new section in the Restatement (Second), Torts, Section 402A, imposes strict liability upon "one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property". It was first applied by the Kentucky Court of Appeals in Dealers Transp. Co. v. Battery Distrib. Co., Ky., 402 S.W.2d 441, 446–447 (1966). The evidence in this case, however, is that nothing was wrong with the dynamite furnished by Hercules. Explosives from the batch in use at the mine on August 7, 1968 conformed to the specifications set by the Bureau of Mines for permissible explosives. Their sensitivity to impact was not markedly different from that of other permissible explosives sold in the United States. Nor can strict liability be imposed here on the basis of failure to warn of an inherently dangerous condition. Comment *j* under Section 402A says that "where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous". Immediately after the bold-type heading "Before and After Firing" in the *Do's and Don't's* is item 70 which specifically warns the user not to fire a blast until a competent person in charge "has made certain that all surplus explosives are in a safe place". The location of dynamite and detonators on a drilling rig within 45 feet of and in line with a blast in the face is obviously not a "safe place". Hercules was entitled to assume that the warning would be read and

heeded and thus is not subject to strict liability.

■ Similarly the law of negligence will not permit recovery on the allegation of ineffective warning. The Kentucky Court of Appeals stressed clause (b) of § 388 of the Restatement (Second), Torts, in the *Hicks* case (453 S.W.2d at 587). It also places the supplier in this case beyond the ambit of liability. Section 388 provides:

"Chattel Known to be Dangerous for Intended Use.

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

"(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b) *has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and*

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." (Emphasis supplied.)

Comment *k* referring to clause (b) says "one who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them * * * of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved."

Hercules had reason to believe that Peabody had all the special knowledge necessary to use permissible explosives because it is one of the largest users of such explosives in the United States. Moreover, the River Queen Mine and all of its mines are subject to periodic inspections by the United States Bureau of Mines which is charged with seeing that the mine operators apply the special knowledge needed to mine coal safely and competently with permissible explosives. Hercules further had reason to believe that Peabody was observing the requirement that explosives not be stacked in the line of blast because its salesman had been in the River Queen Mine and there witnessed a shot firer carefully check to see that everything was moved out of the line of blast before detonating a shot. Hercules has been selling dynamite to Peabody in substantial quantities for 37 years and over that period had no report of any injuries attributable to the use of explosives by Peabody or any other information reflecting adversely on the competence of Peabody to store, transport and use explosives in mines. Affidavit of R. D. Boddorff, p. 2. Accordingly, Hercules is not subject to liability under Section 388 because it had "reason to believe that those for whose use the chattel is supplied" would realize that it is dangerous to leave explosives stacked in the line of blast at the face of a mine. Jacobson v. Colorado Fuel & Iron Corp., 409 F.2d 1263, 1271–1272 (9th Cir. 1969); Posey v. Clark Equip. Co., 409 F.2d 560, 563–564 (7th Cir.), cert. denied, 396 U.S. 940, 90 S.Ct. 374, 24 L.Ed.2d 242 (1969).

A further defense available under Kentucky law bars recovery under any of the negligence theories advanced by the plaintiffs; it is the defense of superseding cause. American Home Fire Assur. Co. v. Louisville Gas & Electric Co. Ky., 307 S.W.2d 562 (1957). The principle was applied in the *Hicks* case where the Kentucky Court said:

"We need not consider in detail the numerous contentions advanced by appellees on cross-appeal as alternate grounds for recovery. The contributory fault of Hicks would foreclose this

recovery under any theory advanced. If it be assumed that Cox had no personal knowledge of the danger in probing the high spot, the failure of Wabassco's foreman and other supervisory employees to apprise Cox of that fact (which they did know) was such an intervening and unforeseeable act as to insulate Herbert as well as Hercules from liability to Cox." 453 S.W. 2d at 591.

The undisputed fact of knowledge by the supervisory personnel in the instant case regarding the danger of leaving explosives at the face during a shot compels entry of summary judgment in favor of the defendant Hercules on the claim of negligence with respect to the duty to warn of such danger. The failure of the Peabody supervision strictly to enforce the safety rules pertaining to handling of explosives at the face and the apparent efforts of persons in the mine to prevent "strangers" including state and federal inspectors from seeing certain dangerous practices (Transcript 70–71, 80–81) are intervening forces which constitute superseding cause. The user of Hercules' explosives in this case violated a safety statute which requires that dynamite not be kept anywhere in the line of blast in a coal mine. KRS 352.240(7). The violation of the state statute and of the federal regulations proximately caused the deaths of the plaintiffs' decedents. Plaintiffs herein acknowledge (1) the applicability of the statute and the federal regulations to the conduct at the face (2) the violation of the statutes and regulations and (3) that violation thereof directly and proximately caused the deaths sued on. Plaintiffs' Answers to Interrogatories Nos. 18 & 19. Therefore, the misconduct of someone in the mine is negligence as a matter of law in this case. The violation of a safety statute or safety regulations in Kentucky constitutes "negligence *per*

*se*", that is, the court takes over the standard of care fixed by the legislature and will find that its violation is negligence. It is not known who violated the statute. Although nine men were killed on August 7, 1968, the estates of only eight are represented in this action. The ninth man may have misplaced the dynamite, or it may have been the negligence of one of the plaintiffs' decedents which caused this accident. It makes no difference which it was in applying the rule of negligence *per se*. The rule is equally applicable where it is a plaintiff who has violated the safety statute. As Dean Prosser says "safety statutes, such as speed laws and traffic rules, usually are designed for the broad purpose of preventing accidents or dangerous situations, in which the plaintiff is quite as likely to be hurt as the defendant; and it is not difficult to discover a purpose to protect him by setting up a standard of his own conduct, the unexcused violation of which is negligence in itself." Prosser, Torts 204–05 (3rd ed. 1964). See also Couch v. Holland, 385 S.W.2d 204, 208 (Ky.1964); Murphy v. Homans, 286 Ky. 191, 150 S.W.2d 14, 17 (1940).

The major thrust of the instant case is that Hercules failed to warn effectively that dynamite is impact sensitive and should be removed before shooting at the face. Even if Hercules could be blamed in this way, negligence *per se* in the violation of a safety statute and of a safety regulation constitutes a new, independent and efficient cause which severs whatever connection there may be between any omission by Hercules and the injuries.

Accordingly, it is hereby Ordered that the motion of the defendant, Hercules Incorporated for summary judgment be and the same is hereby sustained, and the complaints as to it be and the same are hereby dismissed.