No. 47,953

SANDRA M. JONES, *et al.;* CAROL PEAK, *et al.;* and CARL SMITH, *et al.,* *Appellants,* v. HITTLE SERVICE, INC.; CITIES SERVICE OIL CO.; PHILLIPS PETROLEUM CO., INC.; and MOBIL OIL CORPORATION, a/k/a SOCONY-MOBIL CO., INC., *Appellees.*

(549 P. 2d 1383)

Opinion filed May 8, 1976.

*Harker E. Russell,* of Kahrs, Nelson, Fanning, Hite and Kellogg, of Wichita, argued the cause, and *Darrell D. Kellogg,* of the same firm, was with him on the brief for the appellants.

*James Z. Hernandez,* of McDonald, Tinker, Skaer, Quinn and Herrington, of Wichita, argued the cause and was on the brief for the appellee, Hittle Service, Inc.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause, and *Richard D. Ewy* and *Christopher P. Christian,* of the same firm, were on the brief for the appellee, Cities Service Oil Co.

*Richard I. Stephenson,* of Fleeson, Gooing, Coulson and Kitch, of Wichita, argued the cause, and *Donald R. Newkirk,* of the same firm, was with him on the brief for the appellee, Phillips Petroleum Co., Inc.

*H. E. Jones,* of Hershberger, Patterson, Jones and Roth, of Wichita, argued the cause, and *Michael L. Jones,* of the same firm, was with him on the brief for the appellee, Mobil Oil Corporation.

The opinion of the court was delivered by

FOTH, C.: These are consolidated actions seeking damages for the wrongful death and pain and suffering of three persons who died as the result of a propane gas explosion on the Homer Smith farm near Mulvane, Kansas. Named as defendants were Hittle Service, Inc., the retail distributor that furnished propane to the Smith farm, and Cities Service Oil Co., Phillips Petroleum Co., Inc., and Mobil Oil Corporation, all of whom manufactured and supplied bulk propane to Hittle. After discovery was complete all four defendants filed motions for summary judgment. The parties stipulated that the record at that time contained all the evidence going to the question of liability, and that the court should rule on the motions without considering any affirmative defenses such as contributory negligence. The record consisted of

stipulations, depositions, requests for admissions, and interrogatories. The trial court sustained the motions in favor of all defendants, and plaintiffs have appealed.

The explosion occurred on August 5, 1970, in a storm cellar just south of the Smith farm home. The Smiths' daughter, Nadine Jones, and her husband Kenneth had come by to pick up some tomatoes. Mrs. Ethelda Smith, her daughter and son-in-law went into the cellar where the tomatoes were stored, with Kenneth in the lead. He had reached the bottom and started to light a cigarette when the explosion took place. All three were badly burned and later died.

Propane was supplied to the Smith house by an underground pipe from a tank located to the east of the house. Just before the line entered the house it had a "T" joint, from which another underground line ran south to a chicken brooder house. The brooder house had not been used for some time, and the line to it was capped inside the unused building. The brooder house line ran less than two feet from the storm cellar. Investigation after the explosion revealed that the gas line to the house was sound but the brooder line had extensive leaks. In addition, the storm cellar had numerous cracks in the walls and steps. It was generally agreed that the lethal gas had leaked from the brooder line, seeped through the intervening foot or two of earth, and collected in the cellar.

Propane gas in its natural state is odorless, colorless, volatile, inflammable, and when mixed with air it is explosive. It is also heavier than air, so it has a tendency to collect in low places like the Smiths' storm cellar.

Because propane is odorless an odorizing agent is added to make its presence perceptible to the human nose. The propane delivered to the Smiths was odorized with ethyl mercaptan, which has a foul smell described by all witnesses as being like that of rotten eggs or a dead mouse.

The Smiths first began using liquefied petroleum gas around 1941, at which time they installed a butane system. Butane has characteristics similar to those of propane, and is artificially odorized in the same way. The Smiths had a leak in the butane line in 1955 or 1956, resulting in a fire under their house. At that time they switched to propane and installed a new tank and line to the house. The brooder house line, however, was apparently not replaced at that time.

A few days before the explosion of August 5, 1970, Mrs. Smith returned from a trip to the storm cellar and reported to her husband a strange smell, like something dead. The Smiths discussed the smell and concluded it was probably a dead mouse, since Mr. Smith had put out poison some time earlier. Mr. Smith testified to the conversation, and had told others about it shortly after the explosion. Mrs. Smith told her son about the smell and discussion when she was in the hospital after the explosion.

Liability was asserted against all four defendants on four separate theories: negligence, strict liability in tort, breach of implied warranty, and absolute liability or liability without fault.

We may dispose of the last theory summarily: *Rylands v. Fletcher*, L. R. 1 Ex. 265 (1866) has indeed been followed in this state. See, *State Highway Comm. v. Empire Oil & Ref. Co.*, 141 Kan. 161, 40 P. 2d 355, and cases cited therein. Broadly stated the doctrine is that one who has under his control a dangerous instrumentality is subject to liability without fault if it escapes and causes damage. Here, none of the defendants had the propane in its control when it escaped; none is chargeable with any responsibility for the Smiths' propane system. The rule is inapplicable, and we decline to make sellers of propane insurers of the safety of their customers under all circumstances.

The other three theories are all based in one way or another on two claimed "acts of omission" of the defendants:

First, it is claimed all are responsible for an insufficient level of odorant in the propane. Had there been enough ethyl mercaptan in the Smiths' propane, the argument goes, Mrs. Smith would never have mistaken its smell for a dead mouse and Kenneth Jones would never have tried to light his cigarette. Failure to achieve that level of odorization was the result, it is claimed, of the negligence of all defendants, and constitutes a defect in the product so as to impose strict liability in tort and constitute a breach of warranty.

Second, plaintiffs claim all defendants breached their duty to give adequate warning of the hazards and characteristics (including odor) of propane gas. The failure to warn, it is asserted, like the inadequate odorization, constituted both negligence and a "defect" in the product under the theories of strict liability and implied warranty.

We turn first to the level of odorization. The evidence reveals that standards for handling LP gas have been of concern to the National Fire Protection Association since 1924. Its Committee on

Liquefied Petroleum Gas developed standards over the years which in due course were consolidated as NFPA Standard No. 58, most recently revised in 1965 (as of the hearing below). Section B.1 of that standard deals with odorization, and is nationally recognized by the LP gas industry, federal regulatory agencies, and state regulatory agencies. The Kansas state fire marshal, charged by former K. S. A. 31-207 with making rules and regulations for the storage, use, manufacture and sale of petroleum products and explosive or inflammable fluids, in 1966 adopted NFPA standard No. 58 verbatim. It now appears as K. A. R. 22-8-2:

"(a) All liquefied petroleum gases shall be effectively odorized by an approved agent of such character as to indicate positively, by distinct odor, the presence of gas down to concentration in air of not over one-fifth the lower limit of flammability. Odorization, however, is not required if harmful in the use or further processing of the liquefied petroleum gas, or if odorization will serve no useful purpose as a warning agent in such use or further processing. *Note:* The lower flammable limits of the more commonly used LP-Gases are: Propane, 2.15 percent; butane, 1.55 percent. These figures represent volumetric percentages of the gas in gas-air mixtures.

"(b) The odorization requirement of paragraph (a) shall be considered to be met by the use of 1.0 pounds of ethyl mercaptan, 1.0 pounds of thiophane or 1.4 pounds of amyl mercaptan per 10,000 gallons of LP-Gas. However, this listing of odorants and quantities shall not exclude the use of other odorants that meet the odorization requirement of paragraph (a). (Authorized by K. S. A. 31-207, 75-1511; effective Jan. 1, 1966.)"

In this case the parties stipulated that the propane gas in question had been odorized to the level of one pound of ethyl mercaptan to 10,000 gallons of propane, as required by K. A. R. 22-8-2 (b). Defendants suggest that by virtue of this stipulation it is conclusively established that they were not negligent and the gas not defective insofar as the level of odorization is concerned. We are not prepared to go quite so far. The Restatement of the Law, Second, Torts, § 288 C, poses this rule:

"Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions."

The Comment goes on:

"Where a statute, ordinance or regulation is found to define a standard of conduct . . . the standard defined is normally a minimum standard, applicable to the ordinary situations contemplated by the legislation. This legislative or administrative minimum does not prevent a finding that a reasonable man would have taken additional precautions where the situation is such as to call for them. . . . Where there are no such special circumstances, the minimum standard prescribed by the legislation or regulation may be accepted

by the triers of fact, or by the court as a matter of law, as sufficient for the occasion; but if for any reason a reasonable man would take additional precautions, the provision does not preclude a finding that the actor should do so."

Although this court has not dealt with compliance with statutes and regulations as showing due care (or lack of defect), we have recently considered compliance with industry standards as bearing on the same elements. In *Garst v. General Motors Corporation*, 207 Kan. 2, 484 P. 2d 47, design defects were claimed in the brake and steering mechanism of an earth mover. The court noted that "[o]ne of the most significant factors is whether others in the field are using the same design, or a safer design." (207 Kan. at 21.) The court went on to say:

"While cases indicate that use by others of the same design tends to negative an allegation of negligence, this evidence is not always conclusive, as stated by Justice Holmes in *Texas & Pacific Ry. Co. v. Behymer* (1903) 189 U. S. 468, 47 L. Ed. 905, 23 S. Ct. 622: 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.' (p. 470.)

"This principle has been applied in the field of products-design in *Northwest Airlines v. Glenn L. Martin Company* (6th Cir. 1955) 224 F. 2d 120, where the court said:

"'. . . [T]he fact that Northwest conformed to the practice of other airlines in failing to equip No. 44 with radar did not establish its exercise of ordinary care as a matter of law. Customary practice is not ordinary care; it is but evidence of ordinary care. . . .' (p. 129.)"

We think the same rule should apply to standards set by the legislature (or by regulations having the effect of law) as to those set by an industry. Compliance is evidence of due care and that the conforming product is not defective, and may be conclusive in the absence of a showing of special circumstances. Certainly a manufacturer should be able to rely on such standards in the absence of actual or constructive notice that they are inadequate.

Plaintiffs here attempted to show that the legislative standard was inadequate through the deposition testimony of an expert witness, one Leonard C. Mandell. Mr. Mandell is an engineer with considerable background and training in the use of gas and its odorization, although mostly in the field of natural gas. His testimony may be summarized as follows: Everyone in the industry and in governmental regulation of it believes in the integrity of the standard, but he disagrees with it. His disagreement is not based on any empirical data of his own or that is generally available, but on his personal opinion that those who formulated the

standard weren't qualified. His basic hypothesis is that any time there is an explosion the gas is inadequately odorized; otherwise the victims would have taken appropriate precautions. He opined that an acceptable industry standard should be capable of giving adequate warning to at least 95% of the population who might smell it. He put an acceptable figure at various times in his testimony at either 3, 4, 5, 6, 7, 8, or 9 pounds of odorant per 10,000 gallons, instead of the one pound called for by the standard. Finally, he said that in this particular case even his most rigorous demand would have been inadequate—to have warned the victims here would have required over 100 pounds.

The 100-pound figure is based on the proposition that when the gas passes through soil the odorizing agent is leached out to some extent. There was conflicting testimony as to the operation of this process, with some witnesses saying that absorption of the odorant is limited to the early stages of the exposure of gas to soil. With continued exposure, these witnesses say, the earth reaches its absorptive capacity or a state of "equilibrium," so that further gas passing through it carries its full complement of odorant with it. In our view the rate of absorption is irrelevant to this case, and the conflicts in testimony need not be resolved. The key fact here, as we see it, is the undisputed testimony that Mrs. Smith did smell gas in the cellar shortly before the explosion, even though she did not identify it as gas.

The question before the district court and this court on appeal is whether a jury could reasonably find that the explosion was caused by an unreasonably low level of odorant in the propane. We think not. We do not think a reasonable jury could give credence to plaintiffs' expert opinion testimony on this issue when set against the universally accepted legislative standard. There were no special circumstances here in the Smiths' proposed use of the gas which would have put the sellers on notice that more odorant than usual would be required. Neither had there been any industry-wide or individual corporate experience showing that the legislative standard was inadequate. Under these circumstances the personal opinion of Mr. Mandell, qualified though he might be in the general field, cannot be considered "substantial" evidence of a deficiency in the standard.

Further, even if his testimony were accepted as definitively establishing a new industry standard, there would be a fatal gap in causation. Even if met, his standard by his own testimony would

not have prevented this explosion. Even his highest acceptable figure of nine pounds, he said, was too little to have warned the victims here. More than one hundred would have been required. Yet even he did not suggest that it was negligence not to put in 100 pounds, or that the product was defective without it.

We therefore hold that there was no substantial evidence which would have supported a finding that the explosion was caused by an inadequate level of odorant in the gas.

On the second issue, failure to warn, there is a difference of positions between the three bulk suppliers (Cities Service, Phillips and Mobil) and the retail distributor Hittle. Liability of the suppliers is predicated on a duty to warn the Smiths as ultimate consumers, and a duty to train their distributor Hittle. Liability of Hittle is based on his duty to warn his customers, the Smiths.

Failure to warn the Smiths is further broken down by plaintiffs into two separate claims:

"(1) Failure to warn the public and users of the dangerous propensities, character, aroma, and limitations of propane gas;

"(2) Failure to warn the public and users that a malodorant does not render propane gas wholly safe and that odorization sometimes will serve no useful purpose as a warning agent. . . ."

The second failure, repeatedly referred to throughout plaintiffs' brief, goes to the tendency of the odorant to dissipate when it passes through soil, as discussed above. For the reasons stated in connection with our disposition of the claim of insufficient odorization we find this claim is also legally unwarranted. The fact is that the gas in the cellar was odorized and was smelled by Mrs. Smith, so that a warning that it might be odorless under some circumstances would have had no effect on subsequent events leading to this explosion. Further, the duty to warn arises only when the supplier "knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied". (Restatement of the Law, Second, Torts, § 388 [a].) None of the defendants here knew or had reason to know that the propane gas would be piped through a leaky line and from there filter through the earth to a place where it might collect. And barring such leakage and filtration, the tendency of the odorant to dissipate did not make the gas "likely to be dangerous." Since the defendants are not chargeable with knowledge that this characteristic of the gas made it likely to be dangerous to the Smiths, they had no duty to warn of this particular characteristic.

Of more consequence, is the failure to warn of the other properties of the gas, and in particular of its peculiar smell which might be (and apparently was) mistaken for other foul odors sometimes found around farms, specifically rotten eggs and dead mice. Such a failure to warn may be both negligence under Restatement of the Law, Second, Torts, § 388, or make the product "defective" under the theories of implied warranty or strict liability in tort. See Comment (*h*), Restatement of the Law, Second, Torts, § 402 A. (That section, dealing with strict liability in tort, was adopted by this court in *Brooks v. Dietz,* 218 Kan. 698, 545 P. 2d 1104.)

On this issue we deal first with the duty of the three manufacturer-distributors. Their only dealings were with Hittle, to whom they sold in bulk and by whom their products were intermixed in Hittle's bulk storage tanks. No agency relationship existed or is claimed. The first question is whether they owed an independent duty to warn an ultimate consumer who was unknown to them. We think not.

We considered a somewhat similar claim in *Hendrix v. Phillips Petroleum Co.,* 203 Kan. 140, 453 P. 2d 486. In that case the distributor, Fortner, had undertaken to make repairs after an LP gas explosion. A second explosion occurred while the repairs were in progress, injuring two workmen. It was claimed Phillips, the bulk supplier, had not adequately trained the distributor Fortner—a claim made here with respect to the suppliers' training of Hittle. This court approved the following instructions:

"You are instructed that defendant Phillips had a duty to instruct Fortner or ascertain that he had been instructed as to the proceedings to be followed in the event of a leak in an L. P. gas system or explosion.

"In this connection it is not required that Fortner be educated or instructed as an expert in the field. Phillips has the duty to instruct or ascertain that Fortner has been instructed to the extent that he have such knowledge as is reasonable under the circumstances to give him information sufficient to take appropriate action and give appropriate advice to his customer. The violation of such duty is negligence.

"Phillips, once having fulfilled the above duty, cannot be held liable for Fortner's failure to take advantage of, use or impart to others such instruction." (203 Kan. at 153.)

As to any duty to advise and instruct the ultimate consumer, the court found there was none. The court distinguished *Hulke v. International Mfg. Co.,* 14 Ill. App. 2d 5, 142 N. E. 2d 717, where the manufacturer and distributor were both held liable for an LP gas explosion. There, the court noted, the gas was sold in bottles

bearing the manufacturer's label. A warning to the consumer on the bottle was obviously feasible. The court went on:

"Unlike the process in *Hulke*, in this case Phillips sold and delivered L. P. gas in bulk to Fortner. The gas was not delivered to the customer in a Phillips container. Fortner stored the gas in his tanks and delivered it to the tanks of customers when sold. As the court instructed, it was the duty of Phillips to instruct or ascertain that Fortner had been instructed to the extent that he have reasonable knowledge under the circumstances, including the ability to give appropriate advice to customers." (203 Kan. at 157.)

A similar result was reached in *Parkinson v. California Company*, 255 F. 2d 265 (10th Cir. 1958). In that case the defendant manufacturers sold propane to McHade, a transporter, who delivered it to Teton, a retail distributor, who in turn sold it to plaintiff. Teton put it in a new steel tank at plaintiff's place of business, where a chemical reaction destroyed the odorant. An undetected leak·caused an explosion. Plaintiff contended the defendant manufacturers had a duty to warn against the possible loss of the odorant, a claim characterized by the court as follows:

". . . The plaintiff contends that in addition to the duty to properly odorize the propane gas, the law imposes a duty upon the defendants to warn McHade upon the delivery of the product that the odor would be destroyed if placed in new steel containers. The essence of plaintiff's contention is that the defendants owed a duty to warn their purchasers of the peculiar characteristics of the product, and how certain methods of handling it, which they might foresee, would make it inherently dangerous, and that this duty was continuous and a failure to fulfill that duty was a proximate cause of the explosion. Relying upon evidence that McHade and Teton knew of the dangerous character of liquid propane gas, that for many years they had operated an extensive business of retailing it and installing hundreds of new facilities for its use, and that information concerning the chemical reaction which would take place in new steel tanks destroying the odor was contained in many of the trade publications which were read by or were available to the purchasers, the trial court found that the purchasers knew, or by the exercise of reasonable diligence should have known, that such chemical reaction was likely to occur." (255 F. 2d at 268.)

Such knowledge on the part of McHade and Teton, the court held, satisfied the manufacturers' duty to warn or instruct them. As to a duty to the ultimate consumer the court went on:

". . . The propane was delivered to McHade, not in containers, but in bulk. It was taken from the refinery and placed in storage tanks belonging to the member corporations. When it was sold, there was no method by which defendants could warn the plaintiff how it should be handled. The gas was not being sold in original containers, and as it was not known to whom Teton might sell the same, defendants could only warn the purchaser McHade. McHade and Teton knew of the possible chemical reaction. Warning is re-

quired to impart knowledge, and if that knowledge has already been acquired, it is not necessary. 46 Am. Jur., Sales, §§ 804, 816; 65 C. J. S. Negligence § 100; 164 A. L. R. 371." (*Id.* at 269.)

A bulk supplier to a retail distributor is in an entirely different position from one who sells packaged commodities or who deals directly with the consumer. If the goods are packaged it is entirely feasible for the manufacturer to include an appropriate warning on the package. That was the rationale of *Steele v. Rapp*, 183 Kan. 371, 327 P. 2d 1053, where we imposed a duty on a manufacturer of fingernail polish to label the bottle so as to indicate its explosive propensities. It also explains *Hubbard-Hall Chemical Company v. Silverman*, 340 F. 2d 402 (1st Cir. 1965), where it was held that the manufacturer of an insecticide was required to place "adequate" warnings on the bags in which it was sold. Warning to an employer-purchaser through English language bag labels was not enough when it was foreseeable that the insecticide would be used by Spanish speaking semi-literate farm laborers. For them an unmistakable symbol like a skull and cross-bones was required. Had the insecticide been sold in bulk and adequate warnings given to the employer it is doubtful if the same result would have been reached.

*Hubbard-Hall* was discussed in *Younger v. Dow Corning Corporation*, 202 Kan. 674, 451 P. 2d 177, which involved a chemical spray which was potentially hazardous to the user's health. We held that the manufacturer had fulfilled its duty when it gave adequate warning to the industrial user, the employer of the plaintiffs. Although the court specifically noted that it was not there confronted with "a highly dangerous explosive or poisonous product," we think that observation was not essential to the holding. If the product is sold in bulk, adequate warning to the vendee is all that can reasonably be required. If the vendee fails to pass on the warning, it seems to us there is a break in the chain of causation by virtue of the intervening failure. On the other hand, if the product is packaged ordinary prudence may require the manufacturer to put his warning on the package where it is available to all who handle it. In *Younger* it is not clear whether the product was packaged or sold in bulk. In *Hendrix v. Phillips Petroleum Co.*, supra, the product was dangerous but it was clear that it was sold in bulk. We held that the manufacturer's duty stopped with its vendee.

The distinction is recognized in *Zunck v. Gulf Oil Corporation*,

224 So. 2d 386 (Fla. App. 1969), where the manufacturer and wholesaler sold unodorized gas in bulk to a retail distributor who contracted to odorize it. The court pointed out:

"The general rule is that in view of the highly dangerous character of gas and because of its well-known tendency to escape and become an element entailing not only possible but probable death and disaster, a gas supplier should exercise the care and precautions proportionate to the danger. Although a manufacturer may be liable for failing to odorize gas, the appellants have failed to cite any cases, and we have found none, which indicate that a manufacturer or distributor selling *in bulk* to one other than an ultimate consumer has a nondelegable duty to odorize, provided it takes the necessary precautions commensurate with the dangers reasonably anticipated under the circumstances." (p. 388. Emphasis in original.)

By the same token the wholesaler is seriously hampered in any attempt to communicate directly with the ultimate consumer. As pointed out in *Parkinson v. California Company,* supra, the bulk wholesaler has no way of telling who the ultimate purchaser might be, and has no package on which to endorse any warning. The best the wholesaler could do would be to furnish literature to his retailer and hope it was passed on—a chancy operation at best. We fail to see how this procedure improves upon a situation where the wholesaler deals with a knowledgeable retailer. In either event the wholesaler must depend on his vendee to pass on his message, and cannot do so himself.

On this issue plaintiffs once again rely on the testimony of their expert, Mandell. He testified that there is no industry standard or custom that gas suppliers warn the ultimate consumer about the odor of their product, but that several utility companies selling natural gas have adopted a practice of sending out "scratch me" literature which, when scratched, gives off an odor similar to that added to their gas. These utilities, of course, are dealing directly with their own customers. In addition, Mandell knew of one propane manufacturer who supplied literature to be furnished by its distributors to their customers, cautioning the customers to familiarize themselves with the odor of propane, since it might be different from that of other gas.

As we said in *Garst v. General Motors Corporation,* supra:

"Negligence is not proved merely because someone later demonstrates that there would have been a better way. Reasonable care does not require prescience nor is it measured with the benefit of hindsight. Tort law does not expect Saturday manufacturers to have the insight available to Monday morning quarterbacks." (207 Kan. at 21.)

We regard Mandell's testimony as to what some utilities are doing as insufficient to raise a jury question as to the duty of the bulk suppliers here.

We therefore hold that the manufacturer of LP gas who sells it to a distributor in bulk fulfills his duty to the ultimate consumer when he ascertains that the distributor to whom he sells is adequately trained, is familiar with the properties of the gas and safe methods of handling it, and is capable of passing on his knowledge to his customers. A manufacturer so selling owes no duty to warn the ultimate consumer, and his failure to do so is not negligence and does not render the product defective.

In this case there was no question as to Hittle's knowledge and capabilities. The owner, Lloyd Hittle, had been in business since 1956 and operated three bulk plants. He belongs to the Kansas LP Gas Association, is visited regularly by an insurance engineer and a state fire marshal representative, has a library on propane which he has studied, and knows the characteristics of the gas, including its odor. He testified he was quite capable of passing on any information requested by his customers. The three suppliers breached no duty to plaintiffs when they sold propane to Hittle.

What has been said disposes also of plaintiffs' contention that the suppliers were delinquent in training their distributor. Hittle, it clearly appears, needed no training.

We turn finally to the duty of Hittle to warn the Smiths as to the odor of propane and the likelihood of its being mistaken for something else. In the court's view this issue presents a jury question.

There can be no doubt that propane is potentially a highly dangerous substance, and those dealing with it are held to a high degree of care. *Kitchener v. Williams*, 171 Kan. 540, 236 P. 2d 64. And cf., *Carlisle v. Union Public Ser. Co.*, 137 Kan. 636, 642, 21 P. 2d 395; *House v. Wichita Gas Co.*, 137 Kan. 332, 20 P. 2d 479. Lloyd Hittle himself testified, "[i]f you were selling a person who knew nothing about propane, I think you should tell them about what it smells like so that they would recognize it if they ever had a leak." Hittle admittedly gave no specific warnings to the Smiths prior to the explosion, and none of Hittle's employees had ever discussed propane or its characteristics with either of the Smiths. Of course, there was no duty to warn if the Smiths were in fact aware of the danger. The rule was succinctly put in *Garrett v. Nissen Corporation*, 84 N. M. 16, 21, 498 P. 2d 1359:

"There is no duty to warn of dangers actually known to the user of a

product, regardless of whether the duty rests in negligence under § 388 Restatement (Second) of Torts (1965) or on strict tort liability under § 402 A Restatement (Second) of Torts, supra."

See also, Comment to PIK Civil § 13.05; *Parkinson v. California Company*, supra; *Bryant v. Hercules Incorporated*, 325 F. Supp. 241 (W. D. Ky. 1970).

Whether the Smiths were or were not aware of the characteristics of propane is a matter of dispute. Mr. Smith's knowledge, gleaned from his own testimony, is questionable:

"I know somehing about odorizer. I knew it had a terrible odor to it. I know that LP gas is explosive. When they opened the valve out there, if the wind was just right, you would smell it clear up to the house. I don't know whether the gas is heavier or lighter than just regular air. I had butane before I had propane. We had some trouble with the butane and switched over to propane. I never had any trouble with LP when I called out the Hittle Service."

Obviously if he smelled the odor on the wind when the propane tank was being filled he would associate it with the gas. Just as obviously, when Mrs. Smith smelled the odor in the confines of the cellar she did not associate it with the gas. Her son testified:

"My parents knew propane burned, that it was volatile and explosive, that if it didn't light they were out of gas, and that it contained an additive and odor. I don't believe I ever heard my father discuss possible leaks during the time I lived on the farm, other than the time of the fire underneath the house. When my mother told me about what she had smelled, I believe she put it as being a peculiar odor. She didn't know what it was, that's what she said to me."

On this record we are unable to say conclusively that the Smiths were sufficiently aware of the characteristics of propane so as to excuse Hittle from its duty to warn them, either under a tort theory (Restatement § 388 or § 402 A) or under a theory of implied warranty. The court therefore erred in granting summary judgment in favor of Hittle.

The summary judgments in favor of Cities Service, Phillips and Mobil are affirmed. The summary judgment in favor of Hittle is reversed and the case is remanded for further proceedings in accordance with this opinion.

APPROVED BY THE COURT.

FROMME, J., dissenting. Propane gas is a product with dangerous characteristics. The dangerous nature of this product is not that it has an odorant mixed with it. Industry standards require that odor-

ant be mixed with the gas in order that the consumer may be warned, find the leak and repair the gas line. It is a warning device utilized by suppliers of this dangerous product so that a consumer may be warned. The suppliers properly odorized the gas in this case. Here the leak which resulted in the tragedy occurred in lines under the exclusive control of the plaintiffs. Neither the supplier nor the distributor had any right of access to the lines in which the leak occurred.

Under the agreed facts the warning device, odorant, was present in the gas and the plaintiffs noticed the odor a week before the explosion. Subsequent inspection established that the propane gas which remained in the tank on the premises contained three times the minimum amount of odorant per gallon that is required by agency regulations.

The record on appeal clearly reflects that the plaintiffs had used butane and propane gas on their premises for over thirty years. The dangerous characteristics of butane and propane gas are well known to the general public in a community which has used this type of energy. The plaintiffs were not new to this community and they were not using this fuel for the first time. They knew a leak might occur and a fire or explosion might result. They had experienced a leak which resulted in a fire in their basement in 1956. They knew of the age and location of the old line to their brooder house. They admitted having smelled the odor of gas when their supply tank was filled. They had replaced a leaky supply tank sometime after their fire in 1956. The husband and wife had noticed the offensive odor in the cellar on this occasion and had discussed it before the explosion occurred, but dismissed it as coming from dead mice. No attempt was made by them to locate the source of the odor.

The duty of a distributor of propane gas to a consumer is to warn of the dangerous characteristics of the product. That warning is not required where, as here, the consumer had used the product for over thirty years, knew of the dangers and had experienced these dangers.

The duty being placed on the distributor in this case is unrealistic and results in extending the duty almost to a point of absolute liability. The plaintiffs had experienced the odor from both their previous and present experience. They knew what the odor smelled like yet this court says it is unable to say conclusively that the

Smiths ". . . were sufficiently aware of the characteristics of propane so as to excuse Hittle [the distributor] from its duty to warn them, . . ." The characteristic referred to by this court is not that leaks may occur in old lines, or that a fire or explosion may result or that the gas contains an odorant offensive to the smell. They already knew these things.

What then is this court saying? As I read the opinion the court is saying the distributor must also warn the consumers of the possibility of their own human errors, that they may mistake the odorant which comes from a gas leak for the odor of dead mice. If that be true the court is placing an impossible burden on every distributor. In the *Hendrix* case, cited in the majority opinion, the leaking gas smelled like rotten eggs. To me it smells like crude oil with a high sulfur content. In any event it is offensive and any consumer who has used gas for thirty years and experienced the smell knows what it smells like to him. If a distributor must advise the consumer of what it may smell like to the consumer it is an impossible burden. The next consumer who fails to associate the offensive odor with leaking gas may, under the present decision of the court, think it smells like rotten cabbage, or an open sewer. Any warning by the distributor that the odor is offensive and may smell like rotten eggs, dead mice or rotten cabbage will be an insufficient warning under the present decision.

The duty to warn of the dangerous characteristics of a product sold and delivered in bulk such as propane gas does not require the consumer to be advised of the possibility of his own human errors and propensities.

Accordingly I would affirm as to all defendants.

SCHROEDER, J., joins in the foregoing dissent.