No. 115,383

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARK R. SCHNEIDER,
*Appellant*,

v.

THE KANSAS SECURITIES COMMISSIONER,
*Appellee*.

SYALLABUS BY THE COURT

1.

The scope of judicial review of an administrative agency's action is defined by the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.* Under the KJRA, an appellate court exercises the same statutorily limited review of the agency's action as does the district court.

2.

Interpretation of a statute or an administrative regulation is a question of law over which an appellate court has unlimited review. In doing so, courts no longer defer to the agency's interpretation. When a statute is clear and unambiguous, courts give effect to legislative intent expressed through the words of the statute, rather than make a determination of what the law should or should not be.

3.

K.S.A. 2016 Supp. 77-621(c)(4) requires courts to grant relief if the agency erroneously interpreted or applied the law.

4.

K.S.A. 2016 Supp. 77-621(c)(7) requires courts to grant relief if an agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole. This includes the evidence both supporting and detracting from an agency's finding. Substantial competent evidence is relevant evidence that provides a substantial basis of fact from which the issues can reasonably be determined.

5.

The purpose of the Kansas Uniform Securities Act, K.S.A. 17-12a101 *et seq.*, is to place the traffic of promoting and dealing in speculative securities under strict governmental regulation and control in order to protect investors and thereby prevent the sale of fraudulent and worthless speculative securities.

6.

K.S.A. 17-12a412(d)(13) of the Kansas Uniform Securities Act provides that a person may be disciplined where he or she "has engaged in dishonest or unethical practices in the securities, commodities, investment, franchise, banking, finance, or insurance business within the previous 10 years." Violations of this provision include (1) making unsuitable recommendations in violation of K.A.R. 81-14-5(d) and (2) breaching the fiduciary duty to an investment client in violation of K.A.R. 81-14-5(c), by making unsuitable recommendations.

7.

Unsuitable securities recommendations to an investment client under K.A.R. 81-14-5(d)(1) are recommendations for the "purchase, sale, or exchange of any security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the

client's investment objectives, financial situation and needs, and any other information known by the investment adviser or investment adviser representative."

8.

Under K.A.R. 81-14-5(c) an investment adviser representative "shall not fail to observe high standards of commercial honor and just and equitable principles of trade in the conduct of the person's business. An investment adviser or investment adviser representative is a fiduciary and shall act primarily for the benefit of its clients."

9.

The Financial Industry Regulatory Authority, Inc. (FINRA) is a private entity that acts as a self-regulatory organization for broker-dealers. From time to time it issues notices to its members. Under the facts presented, the Kansas Securities Commissioner did not use FINRA Notice 09-31 regarding certain investment vehicles and the expert witness' testimony regarding the information contained in the Notice as the legal standard for measuring appellant's conduct, but rather merely as evidence bearing upon whether appellant engaged in dishonest or unethical practices in violation of the Kansas Uniform Securities Act.

10.

Under the Rules and Regulations Filing Act, K.S.A. 2016 Supp. 77-415 *et seq.*, "any standard, requirement or other policy of general application may be given binding legal effect only if it has complied with the requirements of the rules and regulations filing act." K.S.A. 2016 Supp. 77-415(b)(1). Under K.S.A. 77-425 "[a]ny rule and regulation not filed and published as required by this act shall be of no force or effect."

3

11.

A rule or regulation is defined by the Rules and Regulations Filing Act as "a standard, requirement or other policy of general application that has the force and effect of law, including amendments or revocations thereof, issued or adopted by a state agency to implement or interpret legislation." K.S.A. 2106 Supp. 77-415(c)(4).

12.

As a general principle of administrative law, agency decisions must be based on known rules and standards. Thus, rules and regulations must be filed and published so that members of the public, and others affected thereby, are not subjected to agency rules and regulations whose existence is known only by agency personnel. When an administrative agency arbitrarily applies a rule that is not embodied in the statutes or published as a rule or regulation, a respondent to an agency action is deprived of fair notice and due process.

13.

A policy is a rule or regulation requiring filing and publication under the Rules and Regulations Filing Act if (1) the agency does not exercise discretion in applying it; (2) it has general application to those having to do business with the agency; and (3) the agency treats it as having the effect of law.

14.

Under the facts presented, the agency's use of FINRA Notice 09-31 did not violate the Rules and Regulations Filing Act, K.S.A. 2016 Supp. 77-415 *et seq.* The notice was merely provided as evidence, not as agency policy, an agency regulation, or the governing legal standard.

4

15.

The nondelegation doctrine prohibits the delegation of governmental power to unelected and politically unaccountable bodies. The nondelegation doctrine flows from the separation of powers principles embodied in Art. 2, § 1 of the Kansas Constitution, which provides that "[t]he legislative power of this state shall be vested in a house of representatives and senate." Under the nondelegation doctrine, State agencies may not delegate their power to make obligatory rules to private individuals or nongovernmental entities.

16.

The Kansas Securities Commissioner's references to FINRA Notice 09-31did not constitute a cession of governmental authority to a private entity in violation of the nondelegation doctrine.

17.

Scienter is not required to prove a breach of fiduciary duty. The requirements of a claim of breach of fiduciary duty are existence of a duty, breach of that duty, and damages resulting from the breach. In the careless management of an investment and the failure to keep the client advised regarding the status of the investment, there is no scienter requirement to establish a breach of fiduciary duty.

Appeal from Shawnee District Court; REBECCA W. CROTTY, judge. Opinion filed June 2, 2017. Affirmed.

*Roger N. Walter* and *Trevor C. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Topeka, for appellant.

*Thomas E. Knutzen*, *Ryan A. Kriegshauser*, and *Christopher D. Mann*, of the Office of the Kansas Securities Commissioner, for appellee.

5

Before MCANANY, P.J., MALONE, J., and STUTZMAN, S.J.

MCANANY, J.: Mark R. Schneider appeals the district court's decision affirming the Kansas Securities Commissioner's order finding that he engaged in a "'dishonest or unethical'" practice in the investment advisory business in violation of the Kansas Uniform Securities Act, K.S.A. 17-12a101 *et seq.*, by selecting an investment for his client that he had no reasonable grounds to believe was suitable. Schneider contends: (1) the district court and the Commissioner erroneously adopted and applied the wrong legal standard in concluding that he violated the Kansas Uniform Securities Act; and (2) the Commissioner's factual findings are not supported by substantial competent evidence when viewed in light of the record as a whole.

*Facts*

Schneider is an investment adviser representative and broker-dealer registered in the State of Kansas and associated with the investment firm Plan, Inc., a Financial Industry Regulatory Authority (FINRA) member-firm. Schneider has a bachelor's degree in accounting and business administration, and he has held a certified financial planner designation since 1987. For Schneider to be designated a certified financial planner involved a 3-year process of taking classes and passing examinations.

FINRA is a regulatory organization for broker-dealers and broker-dealer agents. As a member of FINRA, Schneider regularly received rules or regulation notices intended to provide guidance to FINRA members.

Schneider served as Mary Lou and Jeffrey Silverman's investment adviser for more than 20 years, managing the Silvermans' assets, tax returns, and life insurance.

6

Schneider had full discretionary authority over the Silvermans' investments, and he had the ability to trade on behalf of the Silvermans without their approval.

After battling lymphocytic leukemia for 15 years, Jeffrey died on January 3, 2010. Mary Lou received $1,150,000 in death benefits from Jeffrey's life insurance policy, which she initially deposited in bank accounts that were not under Schneider's control. Prior to his death, Jeffrey handled all of the family's finances including the investment decisions. His assets—consisting mainly of cash with a limited amount of mutual funds and large cap equities—were conservatively managed by Schneider.

The day after Jeffrey's death, Mary Lou called Schneider to discuss her investments. Consistent with the approach he typically took with clients who had recently lost a spouse, Schneider advised Mary Lou not to change her investment portfolio for at least a year. But a few months later, Mary Lou contacted Schneider again to discuss a strategy for generating income from the life insurance proceeds that she received after her husband's death. Mary Lou was not employed outside the home and still had children in school, so she sought a way to invest the money to achieve financial independence and to support her family. Because Mary Lou was not a sophisticated investor, she sought advice from Schneider.

In May 2010, Schneider compiled a financial plan for Mary Lou which analyzed her cash flow, expenses, retirement needs, and income requirements. The objective of the plan was to invest her money to generate income in order for her to achieve financial independence. Schneider's analysis showed that Mary Lou needed monthly income of approximately $10,000 to pay her expenses. In order to generate the level of income Mary Lou desired, Schneider projected that she needed an annual investment return of 6.7%.

Schneider decided to pursue a short-term investment strategy in an attempt to meet Mary Lou's investment goals. He chose to place Mary Lou's assets in inverse investment products that were exchange traded funds (ETFs).

Schneider first became aware of inverse investment products in November 2000 after a downturn in investment markets. In 2001 and 2002, Schneider conducted numerous seminars in order to educate his clients about these products. He visited the headquarters of Rydex, one of the vendors of inverse funds, and spent a week visiting with managers about these investment products. Inverse investment funds became an integral part of Schneider's investment management strategy.

In 2006, Schneider starting using ETFs for his clients' investments. Schneider said he preferred ETFs to inverse mutual funds. He noted that the ETFs had lower internal expenses and the ability to trade like stock on equity markets.

In 2009, FINRA issued Regulation Notice 09-31, "*Non-Traditional ETFs*," an interpretative statement to provide guidance to FINRA members and their agents in recommending and selling securities to clients. This notice indicated that nontraditional ETFs are useful for some sophisticated trading strategies. But the notice cautioned members that they are "highly complex financial instruments" and unsuitable for retail investors who hold them for more than one trading session, particularly in volatile markets.

Schneider read FINRA Notice 09-31 when it was released, yet he did not interpret the notice as an absolute statement that holding these investments for more than 1 day was always unsuitable for his clients. Schneider claimed there was no difference in the level of care required between nontraditional ETFs and other investment products. According to Schneider, the risk comes from the market, not the particular investments.

Despite being aware of the information in FINRA Notice 09-31, Schneider placed essentially all of his 160 retail clients in nontraditional ETFs, including Mary Lou, and he held the nontraditional ETFs for periods lasting longer than 1 day.

By the middle of 2010, Schneider believed investment markets were overvalued and that a stock market crash similar to what occurred a few years earlier was imminent. Schneider met with Mary Lou and discussed investing in inverse funds as a short-term investment strategy. Inverse funds are counter-cyclical: they typically go up as the market declines. Schneider explained that his two-step strategy was first to invest in inverse funds in order to take advantage of a declining market, and then to invest in dividend paying equities after the anticipated market correction occurred. Schneider stated that he "was under the impression that [Mary Lou] agreed to that."

Schneider liquidated the positions held in Mary Lou's discretionary accounts and began buying leveraged and inverse ETFs.

The market was very volatile during this period of time. From June 2010 to August 2010, Schneider placed stop-losses on these positions, which liquidated the investment when the investment declined by a certain percentage. But every time a stop-loss was triggered, Schneider placed a larger one in its place. Schneider first put the stop-losses at 3%, then 4%, and finally at 10%. Schneider said he increased the stop-loss parameters because Mary Lou's positions were being continually stopped out. Schneider eventually removed the stop-losses entirely in September 2010.

Contrary to the advice in FINRA Notice 09-31, Schneider held various leveraged and inverse ETF positions in Mary Lou's discretionary accounts for periods exceeding 1 day. The prospectus warned investors that these nontraditional ETFs were not intended to

achieve their investment objectives for a period longer than 1 day. Many of Mary Lou's positions were held for over 100 days, and three positions were held for 182 days.

Mary Lou saw some gains through the summer of 2010, but those gains did not continue. By the end of 2010, Mary Lou's accounts managed by Schneider suffered a net out-of-pocket loss of $68,327.69, or 3.4% of Mary Lou's total assets.

At no time did Schneider inform Mary Lou that he was using nontraditional ETFs, the risks associated with those investments, or that he planned on using them in contravention of how they were designed to be used. He did not advise her that her investments exposed her to the potential for large losses. Schneider's unilateral decision to invest Mary Lou's funds in nontraditional ETFs cost Mary Lou $94,710.

On October 2, 2012, the Kansas Securities Commissioner gave a notice of intent to impose administrative sanctions against Schneider under K.S.A. 17-12a412 of the Kansas Uniform Securities Act. The notice alleged that Schneider violated K.A.R. 81-14-5(d)(1). The Commissioner contended that Schneider's "purchases of the inverse and leveraged-inverse ETFs on behalf of Ms. Silverman constitute unsuitable recommendations and a breach of his fiduciary duty as an investment adviser representative."

Schneider requested a hearing, and the administrative law judge conducted a hearing on October 23-24, 2014.

Jack Duval testified as an expert for the Commissioner. Duval stated that nontraditional ETFs were not suitable investments for investors needing income and growth, such as Mary Lou. Duval said that investing in nontraditional ETFs for more than 1 day is unsuitable for the average retail investor. In Duval's opinion, investing in the

10

nontraditional ETFs for longer than a day is contrary to the prospectuses because these ETFs are speculative investments that are subject to constant leveraging.

Duval testified that if an investment adviser intended to use nontraditional ETFs in a manner not prescribed by the prospectus, it is a breach of fiduciary duty to fail to explain the products and their associated risks to the investor, especially when the investments are made under discretionary authority. In addition, Duval said that an investment adviser breaches his or her fiduciary duty by failing to inform a growth and income client that he or she is investing in speculative products—such as nontraditional ETFs—even if the investments conformed to the prospectuses. During his testimony, Duval referred to FINRA Regulatory Notice 09-31 and an article written by Duval, "*Leveraged and Inverse ETFs:  Trojan Horses for Long-Term Investors.*"

Duval testified that inverse and leveraged ETFs should not be held for more than 1 day because the investment will necessarily erode and lose money as a result of the constant leveraging trap. The constant leveraging trap refers to the daily internal rebalancing to keep the fund leverage ratio constant and consistent with the target relationship to the fund's underlying index. According to Duval, this daily rebalancing works against the investor and causes the investment to erode in value and lose money. Duval testified that an investment adviser representative exercising his or her discretion in investing in and holding nontraditional ETFs for longer than 1 day constituted a breach of the investment adviser representative's fiduciary duty. Duval testified that the investment adviser would also have a duty to explain the product and the risks associated with the product before using it.

Duval reviewed Mary Lou's account statements and found that many inverse ETFs were held for long periods of time, many longer than 30 days. The investments were unsuitable because they were used contrary to the way they were designed. Duval

concluded: (1) Mary Lou's losses were a direct result of Schneider's misuse of the ETFs; (2) nontraditional ETFs were unsuitable investments for Mary Lou; and (3) it is a breach of a fiduciary duty to place a client's assets into unsuitable investments.

On February 5, 2015, the ALJ issued his order, ruling that Schneider violated K.S.A. 17-12a412(d)(13), K.A.R. 81-14-5(d)(1), and K.A.R. 81-14-5(c). The ALJ found Duval to be a credible witness. He also found that Schneider appeared arrogant at the hearing, and he took no responsibility for the fact that he might have been wrong in his decision to invest Mary Lou's assets in nontraditional ETFs. The ALJ indicated that Schneider claimed to know how nontraditional ETFs were to be used, but "the evidence presented showed a total disregard for the accepted wisdom regarding the suitability of Non-Traditional ETFs." The ALJ found evidence presented that indicated that nontraditional ETFs were not designed to achieve their investment objectives over a period of time longer than 1 day.

Both parties filed petitions for review. On May 1, 2015, following oral arguments, the Commissioner confirmed the ALJ's findings of fact and conclusions of law in a final order. The Commissioner also made additional findings of fact and conclusions of law, including the following:

> "Various regulatory notices and advisories indicate that an adviser must be intimately familiar with Non-Traditional ETFs. It is clear from the respondent's testimony, when taken as a whole, that he: 1) was not nearly as knowledgeable as he should have been regarding the product; 2) disregarded accepted industry practice in how the product was to be used; 3) ignored regulatory guidance; 4) failed to trade the product as intended; 5) failed to monitor the investments appropriately; and 5) lost Silverman a significant sum of money as a result."

12

The Commissioner upheld Schneider's violations. Schneider was ordered to pay restitution of $94,720.60 and a civil penalty of $25,000.

On May 29, 2015, Schneider filed a petition for review with the district court under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq*. After reviewing the agency record and the briefs, the district court affirmed the Commissioner's final order. Schneider then appealed to this court.

*Discussion*

The scope of judicial review of a state administrative agency action is defined by the KJRA, K.S.A. 77-601 *et seq.* We review decisions on petitions for judicial review of agency actions as in other civil cases. K.S.A. 77-623. The party asserting the invalidity of an agency's action bears the burden of proving invalidity. Likewise, the burden of proving the invalidity of the Commissioner's actions and decision is on the party asserting invalidity. K.S.A. 2016 Supp. 77-621(a)(1); *Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 953, 335 P.3d 1178 (2014). Under the KJRA, we exercise the same statutorily limited review of the agency's action as does the district court. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010).

Interpretation of a statute or an administrative regulation is a question of law over which we have unlimited review. *In re Tax Appeal of LaFarge Midwest*, 293 Kan. 1039, 1043, 271 P.3d 732 (2012). In making the unlimited review of a Kansas statute, we no longer defer to the agency's interpretation. See *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013). When a statute is clear and unambiguous, we give effect to legislative intent expressed through the words of the statute, rather than make a determination of what the law should or should not be. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

13

In K.SA. 2016 Supp. 77-621(c), the legislature set out eight standards under which we grant relief under the KJRA. Here, Schneider relies on K.S.A. 2016 Supp. 77-621(c)(4), (c)(7), and (c)(8) to support his argument that relief should be granted.

K.S.A. 2016 Supp. 77-621(c)(4) requires us to grant relief if the agency erroneously interpreted or applied the law.

K.S.A. 2016 Supp. 77-621(c)(7) requires us to grant relief if the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in the light of the record as a whole. After being amended in 2009, K.S.A. 2016 Supp. 77-621 now defines "in light of the record as a whole" to include the evidence both supporting and detracting from an agency's finding. We must now determine whether the evidence supporting the agency's factual findings is substantial when considered in light of all the evidence. K.S.A. 2016 Supp. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183, 239 P.3d 66 (2010). Substantial competent evidence is relevant evidence that provides a substantial basis of fact from which the issues can be reasonably determined. *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009).

Finally, K.S.A. 2016 Supp. 77-621(c)(8) requires us to grant relief if the Commissioner's action is otherwise unreasonable, arbitrary, or capricious.

*Overview of Kansas Uniform Securities Act, K.S.A. 17-12a101 et seq.*

The purpose of the Kansas Uniform Securities Act, K.S.A. 17-12a101 *et seq.*, is to place the traffic of promoting and dealing in speculative securities under strict governmental regulation and control in order to protect investors and thereby prevent the sale of fraudulent and worthless speculative securities. *Klein v. Oppenheimer & Co.*, 281

14

Kan. 330, Syl. ¶ 1, 130 P.3d 569 (2006). An action under the Kansas Uniform Securities Act may be prosecuted by the Commissioner under K.S.A. 17-12a412.

In this action, the ALJ, the Commissioner, and the district court found that Schneider violated K.S.A. 17-12a412(d)(13) of the Kansas Securities Act, which provides that a person may be disciplined where he or she "has engaged in dishonest or unethical practices in the securities, commodities, investment, franchise, banking, finance, or insurance business within the previous 10 years."

The Commissioner found that Schneider violated the Securities Act by committing two dishonest or unethical practices under the Kansas regulations: (1) making unsuitable recommendations in violation of K.A.R. 81-14-5(d) and (2) breaching his fiduciary duty to Mary Lou by making unsuitable recommendations in violation of K.A.R. 81-14-5(c).

K.A.R. 81-14-5(d)(1) provides the standard for identifying a dishonest or unethical practice based on suitability:

> "Unsuitable recommendations. An investment adviser or investment adviser representative shall not recommend to any client to whom investment supervisory, management, or consulting services are provided the purchase, sale, or exchange of any security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known by the investment adviser or investment adviser representative."

K.A.R. 81-14-5(c) provides that an investment adviser representative's role is that of a fiduciary:

15

"(c) General standard of conduct. Each person registered as an investment adviser or investment adviser representative under the act shall not fail to observe high standards of commercial honor and just and equitable principles of trade in the conduct of the person's business. An investment adviser or investment adviser representative is a fiduciary and shall act primarily for the benefit of its clients."

Schneider notes that the only evidence presented that he breached his fiduciary duty was that he made an unsuitable recommendation. Thus, the crux of the case turns on whether Schneider had reasonable grounds to believe that the investment strategy was reasonable.

The standard does not focus on whether the investment was suitable, but whether the adviser had any reasonable grounds to believe the investment was suitable. See K.A.R. 81-14-5(d)(1). This test is different from mere negligence in civil liability, as it requires something more than a retrospective determination that the investment was unsuitable, inappropriate, or lost money.

For the Commissioner to impose a regulatory sanction requires a showing of something more than what a client must prove to prevail on a private cause of action for suitability. Under the Kansas regulation, an adviser can have a reasonable basis for believing an investment is suitable at the time the investment decision is made, and it may later be determined in retrospect to be unsuitable. An adviser could be civilly liable under a theory of negligence, but not subject to a regulatory sanction by the Commissioner. See *Jewett v. Miller*, 46 Kan. App. 2d 346, 350, 263 P.3d 188 (2011) (setting out essential elements of negligence).

*Schneider's claims of error*

Schneider's claims on appeal are for the most part variations on a theme. (1) His theme is that the district court and the Commissioner erred in adopting FINRA Notice 09-31 as the governing legal standard for measuring his conduct. (2) For his first variation on this theme, he contends the district court and the Commissioner erred in using FINRA Notice 09-31 as a governing rule or regulation without complying with the Rules and Regulations Filing Act, K.S.A. 2016 Supp. 77-415 *et seq.*; that is, by failing to adopt FINRA Notice 09-31 as a rule or regulation and failing to publish it so that the general public is aware of it. (3) For his second variation on this theme, he contends the district court and the Commissioner erred in delegating to FINRA, a private entity, the governmental power to establish, through FINRA Notice 09-31, the controlling legal standard for measuring the conduct of investment advisers such as Schneider. (4) Finally, Schneider contends the evidence was insufficient to support the conclusions of the district court and of the Commissioner that Schneider engaged in dishonest or unethical practices in violation of the Kansas Securities Act.

Though these claims clearly are interrelated, we will consider and discuss each of them separately.

*Did the Commissioner erroneously adopt FINRA Notice 09-31 as the governing legal standard?*

Schneider first argues that the Commissioner and the district court erred in adopting the wrong legal standard in reaching the conclusion that he committed misconduct. He claims the Commissioner continuously examined his actions under the lens of FINRA Notice 09-31 rather than the controlling Kansas statute and administrative regulations. Schneider asserts that the district court's and the Commissioner's use of

17

FINRA Notice 09-31 constituted an erroneous application of the law subject to review under K.S.A. 2016 Supp. 77-621(c).

The Commissioner takes the position that neither the ALJ nor the Commissioner adopted FINRA Notice 09-31 as a standard of general application having the force and effect of law.

Schneider presents this issue as three different issues: (1) whether FINRA Notice 09-31 was erroneously adopted as a governing legal standard; (2) whether adopting FINRA Notice 09-31 as a governing legal standard rendered the final order void; and (3) whether adopting FINRA Notice 09-31 as a governing legal standard violated the nondelegation doctrine. But these three issues turn on one primary question: Did the ALJ, the Commissioner, or the district court adopt FINRA Notice 09-31 as a standard of general application having the force and effect of law? The Commissioner claims that FINRA Notice 09-31 was used merely as evidence and not as a governing legal standard.

Schneider asserts that the district court and the Commissioner erroneously relied solely on the advice in FINRA Notice 09-31 providing that nontraditional ETFs are not suitable for a time period of more than 1 day. He complains that the district court and the Commissioner failed to take the additional step, as required by the Kansas standard, to determine whether he had a reasonable basis for believing the investment was suitable. He claims there is a conflict between FINRA Notice 09-31 and the Kansas regulation, "which expressly grants an investment adviser latitude to take a subjective look into an individual client's needs and form a reasonable basis for believing an investment is suitable." Schneider claims it is "clear from the record" that throughout all of the stages of the administrative proceeding the Commissioner took the position that the investments were unreasonable if held for more than 1 day "without regard to the particular facts or

18

circumstances related to the client or any reasonable basis for the recommendation . . . ." But the record does not support his assertion.

Schneider argues that the Commissioner failed to use the standard provided in K.A.R. 81-14-5 at any stage of the proceedings, beginning with the first interview of Schneider and continuing through the final order of the case. Instead, Schneider asserts the Commissioner relied on the standard as stated in FINRA Notice 09-31 as a legal standard rather than mere evidence. Schneider maintains that the adoption of the wrong legal standard was an erroneous interpretation or application of the law. K.S.A. 2016 Supp. 77-621(c)(4) requires an appellate court to grant relief if the agency erroneously interpreted or applied the law.

For support, Schneider first points to the fact that the initial notice of the Commissioner's intent to impose administrative sanctions refers to language in FINRA Notice 09-31. But the initial notice also contains several references to the Kansas standards as set out in K.S.A. 17-12a412 and K.A.R. 81-14-5, especially in the sections setting forth the Commissioner's allegations that Schneider breached his fiduciary duty and made unsuitable recommendations. The record supports the Commissioner's position that the agency recognized and understood the legal standard under Kansas law.

Second, Schneider complains that the Commissioner's expert, Duval, pointed to FINRA Notice 09-31 and testified that nontraditional ETFs are categorically unsuitable for retail investors planning to hold them for longer than one trading session. Duval testified that inverse and leveraged ETFs will necessarily erode and lose money as a result of the constant leveraging trap. But Duval made it clear that he was relying on various sources in reaching his opinion that holding this type of investment for more than 1 day constituted a misuse of the investment product. Duval testified that his opinion was shared by others:

19

"Q. And you're saying it's a misuse of the investment product to hold these investments for more than one day?

"A. Yes. And it's not just me. It's FINRA. It's the SEC. It's the New York Stock Exchange. It's a million academics and a million people in the popular press, the financial press."

Third, Schneider complains that "the Agency's Final Order finds '. . . an investment adviser representative exercising his discretion in utilizing and holding Non-Traditional ETFs for a period longer than one day would constitute a breach of the investment adviser representative's fiduciary duty.'" Schneider makes no further comment about this third point, but he is apparently challenging this finding by the Commissioner. But when the Commissioner's order is read in context, the record shows that this was not a conclusion made by the Commissioner, but rather a finding of fact regarding an opinion testified to by Duval. We find the Commissioner's statement accurately reflects Duval's testimony.

Schneider refers to his fourth point as his most important point. He claims that Duval did not use the Kansas Regulation as the standard to determine whether the investment was suitable by analyzing whether Schneider had reasonable grounds to make the investment. He complains that Duval did not do a "customer specific suitability analysis" for Mary Lou before reaching his conclusion. But it was not Duval's burden to apply the Kansas legal standard. That obligation fell on the district court and the Commissioner. In fact, an expert should not testify as to a legal conclusion, as that is a role left to the tribunal. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 445, 228 P.3d 1048 (2010). Duval's testimony merely provided a piece of evidence for the Commissioner to rely on in reaching the legal conclusion of whether the collective evidence met the legal standards as provided in K.A.R. 81-14-5(c) and (d).

20

Schneider claims that his four points lead to the conclusion that the Commissioner applied the 1-day standard in FINRA Notice 09-31 "without nuance or discretion" and treated the standard as having the effect of law in concluding that violation of this standard proved a breach of a fiduciary duty.

Schneider points to two other administrative actions in which the Commissioner also applied the same legal standard and reached similar conclusions. In *In the Matter of Cornerstone Securities, LLC and Russell Fieger*, Docket No. 13E023, the Commissioner concluded that the respondent breached his fiduciary duty as an investment adviser when he placed assets in leveraged and inverse ETFs and held them for periods longer than 1 day. And in *In the Matter of Perkins, Smart & Boyd, Inc.*, Docket No. 13E014, the stipulation for consent order cited FINRA Notice 09-31 and found that inverse leveraged ETF funds were held for more than 1 day. In *Perkins*, the Commissioner used this stipulation as a basis for an administrative order sanctioning the respondent. Schneider claims this is evidence that the Commissioner erroneously invoked the FINRA standard rather than analyzing the conduct at issue under the Kansas legal standard.

We find the record controverts Schneider's conclusion that the Commissioner and the district court applied the incorrect legal standard. We find no indication that the Commissioner adopted FINRA Notice 09-31 as a governing legal standard.

Beginning with the notice of intent to seek sanctions, the Commissioner alleged violations of K.A.R. 81-14-5(d)(1) (unsuitable recommendations) and K.A.R. 81-14-5(c) (breaches of fiduciary duty). Next, in the prehearing questionnaire, the Commissioner clearly indicated the alleged violations were of K.A.R. 81-14-5(d)(1) and K.A.R. 81-14-5(c). And in the final order, the Commissioner clearly identifies that correct legal standard under the Kansas regulations. See K.S.A. 17-12a412(d)(13); K.A.R. 81-14-5(c) (breach of fiduciary duty); and K.A.R. 81-14-5(d) (unsuitable recommendations). The

21

orders clearly show that FINRA Notice 09-31 and Duval's testimony regarding the information contained therein was merely some of the evidence considered and not the legal standard relied on by the Commissioner.

The Commissioner found that Schneider violated K.S.A. 17-12a412(d)(13) by making unsuitable recommendations and breaching his fiduciary duty to Mary Lou. The Commissioner specifically found that no evidence was presented to show that Mary Lou was anything other than a retail investor or to show that nontraditional ETFs would be a suitable investment and that using them contrary to the prospectuses would be suitable. Schneider presented no testimony or evidence in support of his position on appeal that the investments were reasonable based on Mary Lou's expectation of becoming financially independent through her investments.

In the conclusion of the order, the Commissioner explicitly indicated an understanding that the mere finding that an investment was made contrary to the information in FINRA Notice 09-31 was not the sole or controlling determination. The Commissioner found there was no evidence that the ETFs would have been a suitable investment for Mary Lou. Accordingly, there is no evidence to show that Schneider had a reasonable basis for believing the investments were suitable. We reject Schneider's claim that the Commissioner and the district court applied the incorrect legal standard in reaching their conclusions.

*Did the Commissioner comply with general legal principles concerning the Rules and Regulations Filing Act and administrative adjudications?*

Although his next argument is unclear, Schneider seems to assert that the Commissioner violated the Rules and Regulations Filing Act, K.S.A. 2016 Supp. 77-415 *et seq.*, by adopting FINRA Notice 09-31 as a standard of general application having the

effect of law. Our interpretation of Schneider's argument is based on the fact that he relies on *Bruns v. Kansas State Bd. of Technical Professions*, 255 Kan. 728, 733-37, 877 P.2d 391 (1994), which is a decision dealing with the Filing Act. At the district court level, Schneider relied on *Bruns*, and the district court also assumed Schneider was asserting a violation of the Filing Act.

Schneider argues that by using FINRA Notice 09-31 as the legal standard to determine whether Schneider violated the Kanas Securities Act, the Commissioner engaged in rulemaking by ad hoc adjudication contrary to the requirements of the Filing Act. Schneider claims that the erroneous adoption of FINRA Notice 09-31 as the legal standard constituted an arbitrary, capricious, and unreasonable action by the Commissioner. K.S.A. 2016 Supp. 77-621(c)(8) requires an appellate court to grant relief if the agency's action is unreasonable, arbitrary, or capricious.

K.S.A. 77-425 states, in relevant part: "Any rule and regulation not filed and published as required by this act shall be of no force or effect." In addition, "any standard, requirement or other policy of general application may be given binding legal effect only if it has complied with the requirements of the rules and regulations filing act." K.S.A. 2016 Supp. 77-415(b)(1).

A rule or regulation is defined by the Filing Act as "a standard, requirement or other policy of general application that has the force and effect of law, including amendments or revocations thereof, issued or adopted by a state agency to implement or interpret legislation." K.S.A. 2016 Supp. 77-415(c)(4).

As a general principle of administrative law, agency decisions must be based on known rules and standards applicable under the facts presented. "The requirement for filing and publishing rules and regulations is primarily one of dissemination of

23

information. Members of the public, and others affected thereby, should not be subjected to agency rules and regulations whose existence is known only by agency personnel." *Clark v. Ivy*, 240 Kan. 195, 206, 727 P.2d 493 (1986). When an administrative agency arbitrarily applies a rule that is not embodied in the statutes or published as a rule or regulation, a respondent to an agency action is deprived of fair notice and due process. See *Bruns*, 255 Kan. at 737.

The *Bruns* court referred to the following factors to determine whether a policy is a rule or regulation under the Filing Act: (1) the agency did not exercise any discretion in applying the written policy; (2) the rule had general application to those having to do business with the agency; and (3) the agency treats its internal policy as having the effect of law. 255 Kan. at 733-34.

In *Bruns*, the Kansas State Board of Technical Professionals relied on a written internal policy of the agency in denying an engineer's application for licensure as a professional engineer by state reciprocity. But the written policy—which denied reciprocity if the applicant had allowed his or her license to expire in the state of original licensure—was not published or filed as an administrative regulation. The governing statute contained no such restriction. Under these circumstances, the Kansas Supreme Court found that the engineer was not given proper notice of the agency's requirements for licensure, and the internal policy was void under the Filing Act. The court focused on the agency's treatment of the policy as binding without discretion. 255 Kan. at 736-37.

The holding in *Bruns* is easily distinguished from the present case, as there is no allegation in this case that the Commissioner sought to enforce an unpublished internal policy of the agency. Schneider acknowledges that FINRA Notice 09-31 "merely provides interpretive guidance" to those who recommend and sell leveraged and inverse

ETFs. As explained earlier, the Commissioner used the FINRA notice as evidence of misconduct, not the binding standard by which conduct must be judged.

In *American Trust Administrators, Inc. v. Kansas Insurance Dept.*, 273 Kan. 694, 44 P.3d 1253 (2002), the American Trust Administrators sought to gain the Kansas Insurance Commissioner's approval for its stop-loss insurance policy. The Insurance Commissioner refused approval of the insurance policy on the basis of a bulletin which had been published by the Office of the Insurance Commissioner and which contained specific criteria for the sale of stop-loss insurance. On appeal, the American Trust Administrators challenged the Commissioner's refusal to approve its policy because the bulletin relied on by the Commissioner constituted a rule or regulation which had not been properly published and filed under the Filing Act. The Kansas Supreme Court held that there was no indication that the Commissioner exercised its discretion when it refused to approve the stop-loss insurance policy based on language in the bulletin. As such, the bulletin was a regulation under the Filing Act and the decision was void. 273 Kan. at 703.

Our present case is also distinguishable from *American Trust*. There, the bulletin relied on by the Commissioner was a document containing criteria specifically issued by the Insurance Commissioner, and there is no evidence that discretion was exercised in its application. But in this case, FINRA Notice 09-31 was not used as binding legal authority to be applied without discretion. Rather, it was merely used as evidence in the Commissioner's exercise of discretion.

Schneider also relies on *In re Tax Appeal of Wedge Log-Tech*, 48 Kan. App. 2d 804, 300 P.3d 1105 (2013). In that case, the County appealed from the Court of Tax Appeals' order granting the taxpayer's application for an exemption from ad valorem taxation. The exemption was based on the finding that wireline equipment was excluded

25

from taxation under the category of commercial and industrial machinery under K.S.A. 2012 Supp. 79-223(b). The County argued that the Court of Tax Appeals (COTA) should depart from the historical treatment of this equipment as exempt and take the position that the equipment should be classified with mineral leasehold interests because it is intrinsically related to the oil and gas industry. 48 Kan. App. 2d at 805. This court found that it is the role of the legislature, not the County or COTA, to implement a shift in tax policy. 48 Kan. App. 2d at 816.

Our present case is different from *In re Wedge Log-Tech*. Schneider asserts that by relying on FINRA Notice 09-31, the Commissioner "announced, interpreted, and applied a standard of general application arbitrarily and without notice, and thereby engaged in rulemaking by *ad hoc* adjudication." But there is no indication here that the Commissioner attempted to implement a shift in the governing legal standard or engage in rulemaking. The information admitted into evidence regarding FINRA Notice 09-31 was merely provided as evidence, not as the Commissioner's policy or the governing legal standard. The Commissioner was not asserting a new position or agency regulation when it relied in part on the information contained within FINRA Notice 09-31.

The Commissioner cites *Hemphill v. Kansas Dept. of Revenue*, 270 Kan. 83, 11 P.3d 1165 (2000), as support for the principle that the use of an industry standard as evidence to prove an element of a published statute or regulation does not violate the Filing Act. In *Hemphill*, the drivers sought judicial review of the administrative suspension of their drivers' licenses for failure of a breath test. The statute governing administrative suspensions for failure of a breath test required that the testing procedures used were in accordance with the requirements set out by the Kansas Department of Health and Environment. KDHE had adopted a regulation which stated that breathalyzer testing equipment "'shall be operated strictly according to description provided by the manufacturer and approved by the department of health and environment.'" 270 Kan. at

26

86. Relying on *Bruns*, the drivers argued that because the manufacturer's instructions were not filed as rules and regulations, they had no force and effect under the Filing Act. *Hemphill*, 270 Kan. at 86. Our Supreme Court rejected this argument, holding that the manufacturer's manual was merely used as evidence to show compliance with the regulation and was not a rule or regulation under the Filing Act. 270 Kan. at 87.

The Commissioner persuasively compares the information contained in FINRA Notice 09-31 to the manufacturer's instructions in *Hemphill* because FINRA Notice 09-31 was used as evidence and not as a rule or regulation requiring absolute compliance. Unlike in *American Trust* and *Bruns*, in which the agency policies in question were treated as binding legal authority, FINRA Notice 09-31 was used merely as evidence to prove violations of K.S.A. 17-12a412(d)(13), K.A.R. 81-14-5(d)(1), and K.A.R. 81-14-5(c).

As a final note, Schneider suggests that Duval's testimony provides no basis for the conclusions set out by the Commissioner in the final order because his testimony did not address known industry rules and standards contained in the laws of Kansas. See *Pfannenstiel v. Osborne Publishing Co.*, 939 F. Supp. 1497, 1504 (D. Kan. 1996) (holding expert testimony inadmissible because it was based on expert's own definition of reckless disregard rather than the appropriate legal standard); *Jones v. Hittle Service, Inc.*, 219 Kan. 627, 633-34, 549 P.2d 1383 (1976) (expert testimony not substantial evidence because it did not follow universally accepted standards).

But Schneider fails to point to anything in the record or explain how Duval's testimony contradicted the appropriate legal standards. Schneider did not object to Duval's testimony on this basis, and Schneider has not shown that Duval's testimony did not comply with the Kansas regulations and standards.

At the hearing, Duval clearly indicated that FINRA Notice 09-31 did not impose a categorical prohibition against using nontraditional ETFs for retail investors, noting instead that

> "it could be appropriate in very very narrow circumstances. I wouldn't categorically say that it's just unsuitable for every retail investor. If you had a retail investor who wanted to speculate and was willing to lose big sums of money with this, that might be appropriate, if somebody wanted to hedge a portfolio for one day, it might be appropriate there. But, by and large, these are unsuitable for almost all retail investors."

Duval did not rely solely on FINRA Notice 09-13 in forming his opinions. He referred to investor alerts issued by the SEC, the New York Stock Exchange, and other academic literature from economists and finance professionals warning against holding these investments for more than 1 day.

The ALJ also treated FINRA Notice 09-31 as evidence, referring to it under the factual findings. But FINRA Notice 09-31 was not relied on in the ALJ's conclusions of law and discussion. Instead, the ALJ found that Schneider did not have a reasonable basis to believe that the nontraditional ETFs were suitable for Mary Lou. Nothing in the ALJ's order suggests that it adopted the FINRA Notice 09-31 as a standard of general applicability.

Likewise, in the Commissioner's memorandum filed after the hearing, the Commissioner merely relied on FINRA Notice 09-31 as evidence and does not suggest that the FINRA Notice provided imposed a binding legal standard in Kansas.

Schneider raised his concern to the district court that FINRA Notice 09-31 was treated as a standard of general applicability. He complained that "the ALJ based his

entire decision on the premise that FINRA Regulatory Notice 09-31 governed the advisory activities that are the subject of this disciplinary action, and he determined that this guidance imposed a categorical prohibition on the use of non-traditional ETFs for retail investors such as Mrs. Silverman." Schneider claimed it was legal error for the ALJ to treat FINRA Notice 09-31 "as the governing legal authority" in the case. And in oral argument, Schneider again raised his concerns. In response, the agency reiterated to the Commissioner that it was not the agency's position that FINRA Notice 09-31 should be treated as a standard of general applicability. Rather, the agency indicated that it was relying on FINRA Notice 09-31 as evidence that investing in nontraditional ETFs was unsuitable for Mary Lou.

Counsel for the Commissioner asserted:

"Just to clarify, it was not the staff's position at hearing or any time during the course of this proceeding that [Notice 09-31] provided a categorical prohibition against using these products either for retail investors or for using them in a manner outside of the prospectus.

"What we were simply trying to show, and which we did show, and which the Presiding Officer found to be credible was the FINRA notice to members, in addition to Mr. Duval's testimony and substantial amounts of literature discussing non-traditional ETF's, simply state that it is not typical for retail investors. That's what the notice to members says. That's what Mr. Duval said.

"Mr. Duval did not say that there was a categorical prohibition on using them for retail investors. He says that there was just a tendency for that product to be unsuitable. And why is that? Because non-traditional ETF's are speculative. They are a speculative product.

"And that's what is essentially the nub of this case, whether or not the product itself was suitable, given the circumstances for Mrs. Silverman and Mr. Schneider's ability to use those products in a manner which—which addresses the complexity of the product as is reflected in the industry literature and the notice to members."

29

The Commissioner specifically addressed Schneider's claim that FINRA Notice 09-31 was erroneously adopted by the ALJ as a standard of general applicability:

"Respondent argues that the ALJ incorrectly found that FINRA Regulatory Notice 09-31 ('Notice') governed the advisory activities of respondent in this matter and determined that the Notice imposed a categorical prohibition on the use of non-traditional ETFs for retail investors such as Mrs. Silverman. However, nowhere in the Initial Order did the ALJ find that FINRA Regulatory Notice 09-31 was a governing document or anything other than regulatory guidance. The Notice did, however, serve as substantial competent evidence of industry standards regarding the use of non-traditional ETFs and the risks inherent in using such products. The ALJ did not find that the Notice imposed a categorical prohibition on the use of non-traditional ETFs for a certain class of investors but rather that the Respondent's actions and knowledge level, when compared with the recommended actions and requisite knowledge level suggested in FINRA Notice 09-31, demonstrated that the Respondent: '1) was not nearly as knowledgeable as he should have been regarding the product; 2) disregarded accepted industry practice in how the product was to be used; 3) ignored regulatory guidance; 4) failed to trade the product as intended; 5) failed to monitor the investments appropriately; and [6]) lost Silverman a significant sum of money as a result.

"In sum, the record supports the ALJ's evidentiary findings that the Respondent's disregard of the guidance in FINRA Notice 09-31 factually demonstrated, in part, that the Respondent did not have a reasonable basis to believe the Non-Traditional ETFs were suitable for Silverman."

The Commissioner made clear that FINRA Notice 09-31 was used merely as evidence. The Commissioner noted that the standard of review was governed by K.S.A. 77-527 and that review of the ALJ's conclusions of law was de novo. The Commissioner thus made an independent determination that Schneider violated K.S.A. 17-12a412(d)(13), K.A.R. 81-14-5(d)(1), and K.A.R. 81-14-5(c). As such, unlike cases where the policy in question was treated as binding legal authority, we find the

Commissioner did not adopt FINRA Notice 09-31 as a regulation but treated it merely as evidence. We conclude Schneider has failed to show a violation of the Filing Act.

*Did the Commissioner violate the nondelegation doctrine in applying FINRA Notice 09-31 to determine whether Schneider violated the Kansas Securities Act?*

Schneider contends that the district court and the Commissioner violated the nondelegation doctrine by relying on FINRA Notice 09-31 as the sole legal authority to justify sanctions against Schneider. Because FINRA is a private entity that acts as a self-regulatory organization for broker-dealers, Schneider claims that the Commissioner's reliance on the notice constituted a "cession of governmental authority to a private entity in violation of the non-delegation doctrine." By violating the nondelegation doctrine, Schneider complains the Commissioner's actions were arbitrary, capricious, and unreasonable. K.S.A. 2016 Supp. 77-621(c)(8) requires us to grant relief if the agency's action is otherwise unreasonable, arbitrary, or capricious.

The nondelegation doctrine prohibits the delegation of governmental power to unelected and politically unaccountable bodies. The nondelegation doctrine "flows from the separation of powers principles embodied in Art. 2, § 1 of the Kansas Constitution, which provides that '[t]he legislative power of this state shall be vested in a house of representatives and senate.'" *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 276, 75 P.3d 226 (2003).

Under the nondelegation doctrine, State agencies may not delegate their power to make obligatory rules to private individuals or nongovernmental entities. *Sedlak v. Dick*, 256 Kan. 779, Syl. ¶ 1, 887 P.2d 1119 (1995); see *State v. Crawford*, 104 Kan. 141, 177 P. 360 (1919) (the unlawful delegation of legislative power is contrary to the public policy expressed in the Constitution). The legislature may enact general statutes and grant

31

state agencies discretionary authority to fill in the details, but legislative powers may not be delegated to nongovernmental associations or groups. See *State ex rel. Board of Healing Arts v. Beyrle*, 269 Kan. 616, 629-30, 7 P.3d 1194 (2000); *Gumbhir v. Kansas State Bd. of Pharmacy*, 228 Kan. 579, 581-82, 618 P.2d 837 (1980).

Schneider relies on *State v. Ribadeneira*, 15 Kan. App. 2d 734, 817 P.2d 1105 (1991). But the facts in this case are completely different. In *Ribadeneira*, the defendant's convictions of two counts of securities fraud were reversed based on this court's ruling that the district court committed reversible error by instructing the jury that the failure of the defendant to comply with the provisions of a federal securities regulation was a fraudulent and deceptive practice as a matter of law. This was in error because Kansas had not adopted the federal securities regulations cited in the jury instruction. *Ribadeneira* is a criminal case having to do with erroneous jury instructions. We find no evidence that the Commissioner in our present case delegated to FINRA the task of setting the legal standard for the conduct of an investment adviser in Kansas.

*Are the Commissioner's factual findings supported by substantial competent evidence?*

Finally, Schneider claims that the Commissioner's determination that he violated the Kansas Uniform Securities Act is not supported by substantial competent evidence when viewed in light of the record as a whole. Schneider asserts the record does not contain substantial competent evidence that he lacked a reasonable basis for finding the investments were suitable for Mary Lou or that he breached his fiduciary duty to his client.

K.S.A. 2016 Supp. 77-621(c)(7) allows us to grant relief if the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in the light of the record as a whole. After being

amended in 2009, K.S.A. 77-621 now defines "in light of the record as a whole" to include the evidence both supporting and detracting from an agency's finding. We must now determine whether the evidence supporting the agency's factual findings is substantial when considered in light of all the evidence. K.S.A. 2016 Supp. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183, 239 P.3d 66 (2010). Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined. *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009).

The Commissioner alleged that Schneider engaged in dishonest or unethical practices under the Kansas Uniform Securities Act by making unsuitable investments for Mary Lou and, in turn, breaching his fiduciary duty to her.

K.S.A. 17-12a412(d)(13) provides that Schneider may be disciplined if the Commissioner finds that Schneider "has engaged in dishonest or unethical practices in the securities . . . business within the previous 10 years." And K.A.R. 81-14-5(d)(1) states that dishonest or unethical practices under K.S.A. 17-12a412(d)(13) include

> "[recommending] to any client . . . the purchase, sale, or exchange of any security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known by the . . . investment adviser representative."

K.A.R. 81-14-5(d)(1) provides the standard for determining dishonest or unethical practices based on suitability:

> "Unsuitable recommendations. An investment adviser or investment adviser representative shall not recommend to any client to whom investment supervisory,

33

management, or consulting services are provided the purchase, sale, or exchange of any security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known by the investment adviser or investment adviser representative."

Under K.A.R. 81-14-5(c), "[a]n investment adviser or investment adviser representative is a fiduciary and shall act primarily for the benefit of its client." In addition, "dishonest or unethical practices" also includes breaching fiduciary duties to a client. K.A.R. 81-14-5(c).

Schneider claims that the investment was suitable for Mary Lou. He asserts that he showed that his investment decisions were suitable under the circumstances, and he demonstrated a firm understanding of the terms, features, design, risks, and rewards of the investments. Schneider contends he was aware that at the end of each trading day, he should position the portfolio so that its exposure to the benchmark index was consistent with the fund's objective. Schneider claims he closely monitored the correlation between the values of the ETF funds and the underlying index on a daily basis to determine if the correlation became distorted. He asserts he demonstrated that he understood Mary Lou's financial status, tax status, and investment objectives, conducted extensive due diligence, and monitored the investments with reasonable frequency consistent with his discretionary authority.

Schneider points to the financial plan he put together for Mary Lou, as well as a discussion of her investment goals. He recognized that he identified that Mary Lou's total risk exposure was a relatively conservative 2.4 on a scale of 1 to 10. He explained how he monitored the nontraditional ETF investments, even though he held them for more than a day. Schneider's explanation for Mary Lou's investment losses was that the market went

against both Schneider's and Mary Lou's reasonable expectations. He disputes that the losses were due to the constant leveraging trap. He claims that the evidence does not show that he breached his fiduciary duty to Mary Lou or that he failed to act ethically and honestly.

Schneider also points to weaknesses in Duval's testimony, noting that Duval did not perform an individual analysis of Mary Lou's portfolio to determine whether Schneider provided an unsuitable recommendation. Schneider claims that this was a fatal flaw because K.A.R. 81-14-5(d)(1) plainly makes customer-specific factors part of the suitability analysis under the Kansas Uniform Securities Act.

In considering the record as a whole under K.S.A. 2016 Supp. 77-621, the court must "(1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings. [Citations omitted.]" *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). We "cannot reweigh the evidence or make our own independent review of the facts," but must determine whether the agency's decision has been so undermined by cross-examination or other evidence that it is insufficient to support its decision. *Moore v. Venture Corporation*, 51 Kan. App. 2d 132, 137, 343 P.3d 114 (2015).

The Commissioner points to the following uncontroverted evidence in support of its conclusion that Schneider violated K.S.A. 17-12a412(d)(13), K.A.R. 81-14-5(d)(1), and K.A.R. 81-14-5(c):

- Mary Lou was a retail investor.
- Schneider liquidated positions held in Mary Lou's accounts and began purchasing nontraditional ETFs.

35

- The prospectuses for the nontraditional ETFs, including FINRA Notice 09-31, concurred that nontraditional ETFs are typically unsuitable for retail investors, especially when the investments are held for more than 1 day and during volatile market conditions.

- Schneider did not advise Mary Lou that he was going to invest in nontraditional ETFs on her behalf.

- Schneider did not advise Mary Lou of the risks associated with investing in nontraditional ETFs.

- Schneider held various nontraditional ETFs for periods exceeding 1 day, even for over 180 days, in all instances contrary to the prospectuses for the products and other industry literature.

- Schneider initially placed a series of stop-losses on the nontraditional ETFs, but when they were continually triggered, Schneider placed larger stop-losses until he eventually lifted them altogether.

- Schneider believed there was no difference in the level of care between nontraditional ETFs and other products, indicating that nontraditional ETFs have no inherent risks beyond the market itself.

- Schneider placed nearly all of his 160 retail clients in nontraditional ETFs.

- There is no indication that Mary Lou was an atypical retail investor such that nontraditional ETFs would be a suitable investment for her.

- Between June 2010 and January 2011, Schneider's investments in nontraditional ETFs on Mary Lou's behalf lost over $90,000, or roughly 20 percent of the value of her account.

Duval testified that Schneider's conduct violated the standards in K.A.R. 81-14-5(d)(1) and K.A.R. 81-14-5(c). Duval relied on the legal standards provided in the administrative regulations, and not FINRA Notice 09-31, in reaching his conclusions.

Duval testified that nontraditional ETFs are distinct from traditional ETFs because they require that the leverage ratio be constant. Those investing in nontraditional ETFs must rebalance their portfolio every day. Industry literature refers to this daily rebalancing as the constant leverage trap. Duval used an example from his own published article to show how the constant leverage trap causes nontraditional ETFs to lose value when held for longer than 1 day, even if the underlying index ends at the same level. This constant leveraging causes nontraditional ETFs to lose value in every type of market environment with the possible exception of a market declining day after day. The effects of constant leveraging are more pronounced in a volatile market. Nontraditional ETFs are considered "speculative" investments.

Because Duval believed that nontraditional ETFs were unsuitable for Mary Lou at the time they were purchased, Duval did not analyze what portion of Mary Lou's losses were caused by constant leveraging as opposed to changes in the market. Duval unequivocally testified that nontraditional ETFs were not suitable investments for Mary Lou. Duval said that investing in nontraditional ETFs for more than 1 day is unsuitable for the average retail investor. Investing in nontraditional ETFs for more than 1 day is contrary to the prospectuses because the investments are speculative and because of the constant leveraging.

Duval testified that if an investment adviser intended to use nontraditional ETFs in a manner not prescribed by the prospectus, it is a breach of fiduciary duty to fail to explain the products and their associated risks to the client, especially if the investments are made under discretionary authority. Duval further testified that an investment adviser breaches his or her fiduciary duty by failing to inform a growth and income client that he is investing in speculative products such as nontraditional ETFs, even if in conformity of the prospectuses.

37

The Commissioner concluded that Duval was credible, noting that his testimony was not substantially undermined by cross-examination or other evidence. Duval stated that regardless of the market conditions, if an investor remains in the position longer than 1 day, there will be a loss due to the constant leverage trap. He testified that "you definitely do not want to buy this and hold it because the price is going to go down. And the only variable is how fast it's going to go down." Duval's testimony about the constant leverage trap was corroborated by FINRA Notice 09-31 and other industry literature introduced into evidence.

Duval explained how losses result from the constant leverage trap, stating,

"the longer you hold it, the longer the constant leverage trap works. As I also said, the longer you hold it, the more you're exposed to your bets. In this case, no doubt the bet was completely wrong. So Mr. Schneider is holding on to wrong bets longer and longer. And as they work against him, yeah, the positions have bigger and bigger losses. And the constant leverage trap works against him at the same time."

Schneider's claim that Duval offered no opinion with respect to customer-specific suitability is contradicted by the record. Duval was questioned about Mary Lou's investments:

"Q. You stated that you reviewed the account statements of Mary Lou Silverman. Is that correct?
"A. That's correct.
"Q. And you reviewed the holdings that Mr. Schneider had put Mary Lou in with respect to nontraditional ETFs. Is that correct?
"A. Yes.
"Q. Did you have an opportunity to analyze those statements?
"A. Yes.

38

"Q. And did you reach any conclusions as to the appropriateness of the use of those products in Mary Lou's accounts?

"A. Yes.

"Q. And what was your conclusion on that?

"A. Well, by and large, many of these leveraged and inverse ETFs were held for long time periods. Certainly much longer than a day and, most of them, much longer than 30 days. And this is contrary to how they're supposed to be used. And that puts them, in my mind, squarely in an unsuitable category because they were used against the way they were designed."

Duval concluded that those nontraditional ETFs were not suitable investments for Mary Lou.

Finally, Schneider attacks the sufficiency of the evidence that he breached his fiduciary duties. He argues that the Commissioner had to show that he had scienter to support a finding that he breached his fiduciary duties. But scienter is not required to prove a breach of fiduciary duty. The requirements of a claim of breach of fiduciary duty are existence of a duty, breach of that duty, and damages resulting from the breach. *Horosko v. Jones*, No. 91,375, 2004 WL 2926665, at *1 (Kan. 2004) (unpublished opinion). In the careless management of an investment and failing to keep the client advised regarding the status of investment, there is no scienter requirement to establish a breach of fiduciary duty. See *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1048-50 (11th Cir. 1987) (breach of fiduciary duty does not require showing of scienter or bad faith); *Dunn v. A.G. Edwards & Sons, Inc.*, No. 96,669, 2007 WL 2767997, at *6 (Kan. App. 2007) (unpublished opinion). Scienter is not required to establish a breach of fiduciary duty.

Duval testified that it would be a breach of fiduciary duty to fail to explain nontraditional ETFs to a client before investing in the product. Duval stated:

"If you're an investment adviser, obviously you're a fiduciary. You're charged with looking after the client, putting their interests first. And you're going to use an investment product in a way that it's not designed to be used. And there's warnings all over the place in the prospectus by the people who designed the investment stating this. If you're going to do that, then you would have to, in my opinion, really you would have to paper the file, tell the people, document it, get the people to sign, get the clients to sign something. And in my mind, you would also have to put forth some kind of rationale of why you're going to do that and why it makes sense and have a clear line of sight to some way of making money that way."

In addition, Duval said it would be a breach of fiduciary duty not to tell a client whose stated objectives were growth and income that they were using speculative instruments. According to Duval, it is unethical to deliberately or ignorantly misuse the investment product. In turn, holding ETFs for more than 1 day constitutes a dishonest or unethical practice and a breach of fiduciary duty.

Schneider admitted that he did not explain to Mary Lou the risks associated with the nontraditional ETFs. Schneider also showed a lack of understanding of how nontraditional ETFs differed from other equity products, demonstrating a lack of understanding of the product. When Schneider was asked what the term "constant leveraging trap" referred to, he first stated: "I think I have an idea. But I'm not going to share it because I'm not sure exactly where we're going with this." But when pressed by the ALJ to answer if he knew what the term meant, Schneider changed his answer to no:

"Q. So you do or you do not know what a constant leverage trap is? What the term means?
"A. Not in the context you're asking it. No.
"Q. I'm not asking it in any context?
"A. Let's make it, no.
"Q. Other than the context of this proceeding?

40

"A. Make it no.

"Q. Excuse me. You're talking over me.

"A. We'll make it no.

"Q. You do not know?

"A. Okay. No."

As Duval testified, investing in nontraditional ETFs without adequately understanding the particular risks is a breach of fiduciary duty.

We conclude there is substantial competent evidence to support the Commissioner's findings when viewed in light of the record as a whole. A combination of Duval's testimony, Schneider's testimony, Mary Lou's testimony, and the exhibits admitted at the hearing show that Schneider did not have reasonable grounds to believe that the investment strategy was suitable for Mary Lou's assets and further breached his fiduciary duty to her as his client.

Affirmed.